Scott M. Petersen, #7599
David N. Kelley, #9137
**FABIAN VANCOTT**
215 South State Street, Ste. 1200
Salt Lake City, Utah 84111-2323
Telephone: (801) 531-8900
spetersen@fabianvancott.com
dkelley@fabianvancott.com

*Attorneys for Defendants*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BRUCE M., individually and on behalf of C.M. a minor, | Civil No. 2:20-cv-00346-DBB-DBP |
| Plaintiffs, | |
| vs. | **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| AETNA LIFE INSURANCE COMPANY, and the MARSH & MCLENNAN COMPANIES HEALTH & WELFARE BENEFITS PROGRAM, | Judge David B. Barlow |
| Defendants. | Magistrate Judge Dustin B. Pead |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, and Rule 56-1 of the Local

Rules of Practice for the United States District Court for the District of Utah, Defendants Aetna

Life Insurance Company ("Aetna") and the Marsh and McLennan Companies Health & Welfare

Benefits Program (the "Plan") (collectively "Defendants"), through counsel, submit this

Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment ("Pls.' Mot.") (ECF

No. 25).

## DEFENDANTS' RESPONSE TO PLAINTIFFS'
## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to DUCivR 56-1(c)(3), Defendants restate and respond only to those facts that are genuinely disputed or immaterial.  Defendants' responses are as follows:

13.     Aetna used the Level of Care Assessment Tool ("LOCAT") to evaluate the medical necessity of C.'s treatment at ICH. [Rec. 39, 11603-11618]

**DEFENDANTS' RESPONSE: Disputed as incomplete.  Aetna uses nationally recognized clinical guidelines and resources in making its medical necessity determinations. These include, but are not limited to, the LOCAT, Aetna's Clinical Policy Bulletins, and most importantly the medical judgements of its medical doctor reviewers.  AR 39 – 43. LOCAT provides "guidelines for evaluating the medical necessity of care for mental health disorders."  "LOCAT is not a replacement for good clinical judgment, which should be exercised both in connection with apply the LOCAT guidelines as described below and more broadly in assessing the medical necessity of particular levels of treatment in light of the specific condition for which the member is seeking treatment."  AR 11603.**

17.     According to the LOCAT functional impairment dimension a residential treatment center level of care is recommended when:

   a)     There is either "total or almost total withdrawal from all situations, including social and occupational/education;
   b)     Near complete disruption of relationships; or
   c)     Member expelled and unable to attend school due to mental status.
   [Rec. 11611-11612]

**DEFENDANTS' RESPONSE: Disputed as an incorrect quotation of the LOCAT.**

**The LOCAT does not include an "or" as represented in Plaintiffs' Statement of Fact No.**

**17.  Instead, the portion of the LOCAT reads as follows:**

> **RTC: Appetite disturbances have resulted in significant (20 lb. or more for an adult) weight gain or loss over the last month.  The member is engaged in restricting, binging or purging behavior at least daily over the last two weeks.  Either total or almost total withdrawal from all situations, including a social and occupational/educational.  Unable to care for him/herself. Near complete disruption of relationships. Member fired, expelled and unable to work/attend school due to mental status. An inability to obtain basic needs (such as food, shelter, medical care) due to mental illness.**

**The numbering with the inserted word "or" improperly suggests a listing of individual elements and that only one must be met for RTC care to be appropriate.  AR 11612.**

18.     The LOCAT provided that continued service is appropriate if symptoms continued and one or more of the following conditions existed:

1.     The intensity of service being delivered should be appropriate to the risk level that justified the admission

2.     Complications arising from initiation of, or change in, medications or other treatment modalities

3.     Need for continued observation

4.     Persistence of symptoms such that continued observation or treatment is required

5.     Increased risk of complications as a result of intervention or as a product of newly discovered conditions

6.     Next steps have been identified for transition to a less restrictive level of care and additional time in treatment will reduce the probability of a readmission

[Rec. 574]

**DEFENDANT'S RESPONSE: Plaintiffs' explanation of the LOCAT criteria is**

**misleading.  Instead, the LOCAT requires that the member must continue to require the**

**level of care provided by that facility by evaluating the same factors considered at**

admission.  In addition, progress must be evident to show that the condition or its symptoms are treatment-responsive.  The member must continue to manifest symptoms justifying the principal DSM-5 diagnosis, and one or more of the six criteria outlined in Plaintiffs' Statement of Fact No. 18. .AR 573-74.

21.     C. received medical care and treatment at Intermountain Children's Home ("ICH"). ICH is an inpatient residential treatment facility located in Montana, which provides sub-acute inpatient treatment to adolescents with mental health and/or behavioral problems. [Rec. 478, 1737-1821]

**DEFENDANTS' RESPONSE: Disputed.  The citations provided to not support the facts stated in Fact No. 21.**

45.     In November and December of 2017, C. underwent comprehensive psychological testing. The report from Terry Young, Psy.D, ABN, dated December 11, 2017, stated in part:

> …Test results and behavioral observations of [C.] continue to suggest a disruptive mood dysregulation disorder with possible trajectory into a bipolar disorder. Further, there are features of a childhood onset conduct disorder with aggressive behaviors, incidents of physical altercations, property destruction at home, and running away behaviors. This condition may evolve out of the longstanding inability to self-regulate emotions in the presence of a more activated fear and anger response center…
>
> 2) I am suggesting referral for behavioral management consultation and intervention with a program that can be consistently applied/integrated both at home and at school, and will include parent behavior management training.
>
> 3) As a "plan B", given the increasing frequency and intensity of the behavioral-emotional outbursts, efforts should be directed toward identifying a residential program providing psychological and behavioral supports, and incorporating academics into the treatment program. If this becomes necessary, it would be unlikely a short stay would be sufficient to alter the behavioral and emotional patterns established – especially in light of the recent inpatient hospitalizations which have not offered much beyond marginal and temporary gains. …

[Rec. 1211-1218]

**DEFENDANTS' RESPONSE:  Disputed as Incomplete.  Plaintiffs quoted a portion of the statement, but not the portion that stated that the evaluation revealed variances, both areas of better functioning, as well as decline in performance levels.  Dr. Young described C.'s ADD as mild.  Dr. Young "anticipated that whether it be outpatient or long term residential behavioral intervention, there would be an increase in initial resistance in behavioral acting out."  Dr. Young also suggested an in-home behavioral assessment, teaching skills management, and practicing stress reaction techniques.  AR 1217 – 18.**

61.     He contended that C.'s treatment was consistent with generally accepted standards of medical practice. [Rec. 478-550]

**DEFENDANTS' RESPONSE: While it is undisputed that Bruce suggested that the C.'s treatment was consistent with generally accepted standards of medical practice, he does not explain what that means or provide any list of those qualifications, if in fact that is what such a standard requires.  The citations provide no basis that would make Bruce qualified to make such a blanket statement regarding generally accepted standards of medical practice.**

66.     Bruce also included copies of C.'s medical records with the appeal. These records showed that C. continued to struggle with physical tics, sexualized behaviors, emotional dysregulation, aggression, instability, defiance, threats of violence, and intentionally harming others. He wrote that these medical records showed that C. continued to suffer from the same behaviors that C. had during the month of stay that Aetna had authorized and the records contradicted the justification Aetna gave for the denial. [Rec. 1294-2003]

**DEFENDANTS' RESPONSE:  Defendants agree that Bruce included copies of C.'s medical records with the appeal.  However, Plaintiffs have failed to provide a pinpoint cite to the administrative record in support of his statements describing C.'s specific behaviors. Instead, Plaintiffs simply cite to over 700 pages of medical records and expects counsel for Defendants to locate support for his statements of fact.  Accordingly, this statement should be disregarded.**

81.     In a letter dated November 5, 2019, Bruce was informed that the external review agency had upheld the denial. The letter stated in part:

> Based on review of the historical and clinical information from the provider and the Level of Care Assessment Tool (LOCAT) Guidelines we are upholding the denial for Mental Health Residential Treatment Center level of care for the dates of service from 7/13/18-12/31/18 and going forward as not medically necessary. …

> From 7/13/18-12/31/18, the LOCAT criteria was not met for MH RTC level of care. The patient had some irritability and occasional verbal outbursts. The patient was not actively suicidal, homicidal or psychotic. The patient was not physically aggressive. The patient had adequate sleep and appetite. The patient was going to groups. The patient's family was involved. The patient was not attempted [sic] to elope. The patient was not acutely manic or sexually inappropriate. Through 12/31/18, the patient continued to have some verbal outbursts, was disruptive in class and groups, acting inappropriately silly, manipulative and testing boundaries. He blamed others for his mistakes. he [sic] had some intermittent episode [sic] of threatening to kill staff when upset, but was able to calm and there is no indication of plan or intent. The patient was medication compliant. He was able to work on some coping skills, but the patient's defiance and oppositional behavior was ongoing throughout. This appears to be more of a chronic behavior. Treatment could have been addressed at a lower level of care.

> Therefore, the patient does not meet the Aetna's [sic] Level of Care Assessment Tool (LOCAT) criteria for coverage of mental health residential treatment center level of care from 7/13/18-12/31/18 and forward. …

> There are no clinical circumstances unique to this particular patient that would make it medically necessary based on the plan definition and current medical literature. …

[Rec. 5084-5093]

**DEFENDANTS' RESPONSE: Disputed as confusing.  There are two November 5, 2019, letters referenced in Plaintiffs' Statement of Fact No. 81.  The first is a letter from Aetna to Bruce notifying him of the external reviewer's conclusions.  AR 5084-85.  The second letter, also dated November 5, 2019, is from the MRIoA, the external review agency. AR 5087 – 93**

<u>ARGUMENT</u>

I.     **THE COURT MUST REVIEW AETNA'S DECISION FOR AN ABUSE OF DISCRETION.**

A.     **The Plan Grants Aetna Discretionary Authority.**

Plaintiffs do not dispute that the Plan grants Aetna discretion to administer claims for benefits or interpret the terms of the Plan.[1]  The Plan grants Aetna, as the applicable Claims Administrator, "full discretion and authority to make all such claims/benefits determinations."[2] This language is sufficient to confer discretion on Aetna and require the Court to apply the arbitrary and capricious standard of review.[3]  Under this type of discretion, "any reasonable basis will be upheld; it need not be the only logical or even the best decision."[4]  As long as the administrator's decision "fall[s] somewhere on a continuum of reasonableness—even if on the

---

[1] *Charter Canyon Treatment Ctr. v. Pool Co.*, 153 F.3d 1132, 1135 (10th Cir. 1998)( A court "applies an 'arbitrary and capricious' standard to a plan administrator's actions if the plan grants the administrator discretionary authority to determine eligibility for benefits or to construe the plan's terms.").
[2] PLAN084.
[3] *See, e.g.*, *Winchester v. Prudential Life Ins. Co. of Am.*, 975 F.2d 1479, 1483 (10th Cir. 1992).
[4] *Rademacher v. Colo. Ass'n of Soil Conservation Dists. Med. Benefit Plan*, 11 F.3d 1567, 1570 (10th Cir. 1993).

low end," the decision will be upheld.[5]  Here, Aetna made the correct determination and, at a

minimum, its decision is supported by the language of the Plan and substantial evidence in the

administrative record.

> **B.**   **The Abuse of Discretion Standard of Review Should not be Modified by Any Purported Procedural Irregularities.**

Although Plaintiffs argue that certain procedural irregularities during the claim and

appeal process require the Court to apply a *de novo* standard of review, the argument is not

supported by court precedent.  Rather, time after time the Supreme Court has applied a

deferential standard of review for administrators whose plans assign them discretionary

authority, without making an exception for procedural irregularities.[6]

Plaintiffs' argument that the Court should apply the Second Circuit's analysis in in *Halo*

*v. Yale Health Plan,*[7] applying *de novo* review regardless of any substantial compliance, is

without merit.  In *Halo*, the court determined that 29 C.F.R. § 2560.5503-1(l) was ambiguous

with respect to the applicable judicial standard of review to apply when a plan fails to use

reasonable claims procedures, and determined that it was meant to eliminate deferential judicial

review.[8]  The District of Utah has repeatedly rejected the *Halo* approach and should do so again

---

[5] *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1097 (10th Cir. 1999).
[6] *See, e.g.*, *Conkright v. Frommert*, 559 U.S. 506, 507, 130 S. Ct. 1640, 1643, 176 L. Ed. 2d 469 (2010) ("*Firestone* . . . . set out a broad standard of deference with no suggestion that it was susceptible to ad hoc exceptions"); *James v. Int'l Painters & Allied Trades Indus. Pension Plan*, 738 F.3d 282, 283 (D.C. Cir. 2013) ("the Supreme Court has never suggested that the standard of review applied to ERISA administrators' benefits determinations should change because of procedural irregularities").
[7] 819 F.3d 42 (2d Cir. 2016).
[8] *Halo*, 819 F.3d at 47.

here.[9]  In *Brian C. v. ValueOptions*,[10] for example, the Court noted there was no basis for changing the Tenth Circuit's standard when the Tenth Circuit has not done so.  Similarly, in *Jo H. v. Cigna Behavioral Health*,[11] the Court expressly declined to follow the Second Circuit's test in *Halo*.  Likewise, in *Harvey T. v. Aetna Life Ins. Co.*, the court stated, "[a]lthough [29 C.F.R. §] 2560.503-1(l)(1) permits a civil action when a plan fails to use a reasonable claims procedure, it says nothing about the judicial standard of review for that subsequent proceeding."[12]  The Court rejected the *Halo* approach and refused to modify the standard of review.[13]  As noted by the Court in *Harvey T.*, "Plaintiff was able to effectively challenge the claim denial, and the court will not change the standard of review on this record."[14]

While this district court has "carved out exceptions to the general rule for procedural irregularities,"[15] these exceptions are not applicable in this case.  Importantly, the Tenth Circuit will apply the deferential abuse of discretion standard of review as long as the administrator has engaged the claimant in a "meaningful dialogue"[16] and when the administrator renders a decision

---

[9] *See, e.g.*, *Joel S. v. Cigna*, 356 F. Supp. 3d 1305, 1313 (D. Utah 2018), appeal dismissed (Mar. 28, 2019) (rejecting *Halo* because no *Auer* deference need be accorded to the Preamble of non-ambiguous 29 C.F.R. § 250.503-1(l)).

[10] No. 1:16CV93DAK, 2017 WL 4564737, at *4 (D. Utah Oct. 11, 2017).

[11] No. 2:17-CV-00110-TC, 2018 WL 4082275, at *8 n.3 (D. Utah Aug. 27, 2018).

[12] *Harvey T. v. Aetna Life Ins. Co.*, Case No. 2:18-cv-351, 2020 WL 7352754, *6 (D. Utah December 15, 2020) (unpublished).

[13] *Id.*

[14] *Id.* at -7.

[15] *Joel S.*, 356 F. Supp. 3d at 1313 (quotations and citation omitted).

[16] *See also* 29 C.F.R. § 2560.503-1(h)(2)(iv) (a full and fair review includes "a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.").

that is "a valid exercise of [its] discretion."[17]  Here, not only did the claims review and appeal process <u>not</u> involve procedural irregularities sufficient to warrant a change in the standard of review, but Aetna also engaged Plaintiffs in a meaningful dialogue and Aetna's decision was a valid exercise of its discretionary authority.  Therefore, pursuant to precedent in the Tenth Circuit as well as the District of Utah, the Court should apply the abuse of discretion standard of review to Aetna's benefits decision.

Finally, Plaintiffs also argue that, because Aetna allegedly did not strictly adhere to DOL regulations in providing a full and fair review under §2590.715-2719(b)(2), Plaintiffs are deemed to have exhausted the internal claims and appeals process, and, because their claim is deemed exhausted, Aetna's adverse benefit determination should be reviewed under the *de novo* standard of review.  Plaintiffs' arguments are misplaced and unavailing because Plaintiffs did exhaust administrative remedies with respect to their ERISA §502(a)(1)(B) claims for benefits.

### C.    Aetna Complied with ERISA's Requirements for Notice of Claim Denials.

Plaintiffs claim Aetna's denial letters failed to contain the information required by federal regulations.[18]  Not so.  The federal regulations require the benefit determination notice to contain the following, in a manner calculated to be understood by the claimant:

(i) The specific reason or reasons for the adverse determination;

(ii) Reference to the specific plan provisions on which the determination is based;

(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

---

[17] *Joel S.*, 356 F. Supp. 3d at 1313-14 (citing *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 631, 635 (10th Cir. 2003) (applying a "substantial compliance" approach).
[18] Pls.' Mot. at 26-27.

    (iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review;

    (v)  In the case of an adverse benefit determination by a group health plan—

        (A) If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request; or

        (B) If the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request.[19]

Here, Aetna's denial letters complied with the statutory requirements.

        1.    <u>Aetna's denial letters provided the specific reasons for the adverse determination.</u>

First, in its July 13, 2018, initial denial letter, Aetna explained its denial as follows:

We reviewed information received about your condition and circumstances. We used the Level of Care Assessment Tool (LOCAT) guidelines for residential treatment. Based on LOCAT criteria and the information we have, we are denying coverage for the requested level of care. The information received does not show that you are reacting too strongly to things and starting intense inappropriate arguments almost every day. Treatment could be provided at a less intensive level of care or in another setting.

The letter further explained:

(Medical Necessity Denial) This coverage denial was based on the terms of the member's benefit plan document (such as the Certificate of Coverage or benefit plan booklet/handbook, including any amendments or riders). The plan does not cover services that are not medically necessary. Please see the reference to non-medically necessary services listed in the Exclusions section of the benefit plan document or refer to

---

[19] 29 C.F.R. § 2560.503-1(g)(1).

the description of medically necessary services in the Definitions or Glossary section of the benefit plan document.[20]

Second, in the first-level appeal response dated March 8, 2019, Aetna identified all of the information it reviewed, including the appeal request, C.'s claim history, authorized representative designation form and release of PHI, C.'s medical records, and the SPD.  Aetna noted that it was upholding the earlier denial based on its review of all the information gathered, and explained the basis for its finding that the continued treatment at ICH was not medically necessary.  Aetna noted that C.'s medical records indicate he entered treatment at ICH with symptoms and behaviors consistent with conduct disorder, disruptive mood dysregulation disorder, and attention deficit hyperactivity disorder.

Aetna noted that C. had prior treatment interventions including inpatient and residential stays, and that for the dates under consideration there were "no reported dangerousness toward self, or others. [C.] continued to present with irritability and verbal aggression, and occasional outbursts. There were no reported issues with sleep, or appetite. [C.'s] social interactions were reported to fluctuate, though nothing is documented indicating significant issues, or extreme behaviors."[21]  Aetna also explained that C. was compliant with his medications, and there was no compelling indication for care in an inpatient setting as of July 12, 2018, or that care could not reasonably continue safely and effectively in lower level of care.  Finally, Aetna explained that LOCAT criteria did not support RTC level of care, but instead supported intensive outpatient treatment with family therapy as the medically necessary level of care.[22]

---

[20] AR 39 – 40.
[21] AR 429.
[22] AR 429.

Third, in the second-level appeal response, dated June 4, 2019, Aetna noted that Plaintiffs were requesting reconsideration of the denial of C.'s continued stay at ICH.  Aetna noted that it was upholding the previous decision to deny benefits for C.'s stay beyond July 12, 2018.  Aetna again referenced the documents it had reviewed, including the level two appeal request, the level one appeal determination, the original claim determination, the authorizations, C.'s progress notes, patient care notes, diagnostic results, consultation notes, submitted medical notes, and the SPD.  Aetna explained that it was upholding its prior decision because the continued care at ICH was not medically necessary.  Aetna provided the specific reasons that treatment was no longer medically necessary as follows:

> Per the information reviewed patient was an 11 year old male admitted to residential care on June 13, 2018 with dates of service through July 12, 2018 previously authorized. He entered treatment with symptoms and behaviors consistent with Conduct Disorder, Disruptive Mood Dysregulation disorder and ADHD, combined type. He had prior treatment interventions including inpatient and residential stays. For the dates under consideration there was no reported dangerousness toward self, or others. He continued to present with irritability and verbal aggression, and occasional outbursts. There were no reported issues with sleep, or appetite. Patient's social interactions were not thought to indicate 'significant issues' with others. He was compliant with medications. His parents were involved and engaged in treatment. As of the date denial according to the information available about the member's condition, he was medically and psychiatrically stable, he denied suicidal and homicidal ideation, he was evidencing psychotic thought processing, he was not exhibiting mania or incapacitating depression. Patient was attending adequately to his activities of daily living and he was attending scheduled treatment activities. He did not require special risk precautions for behavior.
>
> LOCAT did not support MH RTC level of care, did support MH Intensive Outpatient Program (MH IOP) level of care. Patient did not meet all of the following criteria: l) there was an immediate threat of further deterioration in mental status and a danger to self/others if not in RTC level of care and 2) RTC 24 x 7 stay was required for active diagnostic evaluation and treatment of an intensity that could be provided appropriately only in an RTC setting. Denial RTC Upheld and MH IOP is Alternative Level of Care (MH IOP).[23]

---

[23] AR 4045-4048

Aetna explained that the Plan only covers treatment that Aetna determines is medically necessary.  Aetna further explained that Plaintiffs could request an external review of Aetna's decision.

  2. <u>Aetna properly referred to the specific plan provisions on which the determination is based</u>.

  As explained above, in each response, Aetna cited the relevant Plan language and explained how its benefit determinations were consistent with that language.  Aetna's correspondence identified the Glossary section of the SPD for the Plan's definition of Medically Necessary.[24]  Moreover, in its level one appeal decision, Aetna quoted what is covered relating to "Mental Health/Substance Abuse,"[25] and quoted the definition of "Medically Necessary" from the Plan.[26]  Aetna provided similar Plan citations in its level two response.[27]  Aetna satisfied this requirement.

  3. <u>No additional material or information was necessary to perfect the claim</u>.

  Aetna explained that it had reviewed C.'s medical records to date, but noted that Plaintiffs could appeal Aetna's decision by sending in a request that included the appellant's name, member ID number, group name, as well as any comments, documents, records and other information that Plaintiffs wanted Aetna to consider as part of the appeal process.  There is nothing in the record to suggest Aetna lacked any medical records in making its determination or that additional information would have perfected C.'s claim.  To the contrary, the record is comprised of nearly 12,000 pages, much of which constitutes medical records reviewed by

---

[24] AR 39 – 40, 428 – 431, and 4046 – 4047.
[25] AR 429.
[26] AR 429 – 30.
[27] AR 4047.

Aetna, as well as the external reviewer.  Significantly, all the clinical reviewers analyzing the record determined that C.'s continued care at ICH was not medically necessary, and not one of them suggested that the record was incomplete.  Finally, Aetna explained that the clinical criteria upon which the decision was based was available free of charge upon request.  Thus, Aetna satisfied this requirement.

       4.      Aetna provided the plan's review procedures and required time limits.

It is undisputed that Aetna provided the procedure and time limits required by the Plan in each of its denial letters.  Plaintiffs do not claim otherwise.  This requirement is met.

       5.      Aetna provided a copy of the LOCAT used to assist it in making its medical necessity determination.

Aetna explained that as part of its decision-making process, it uses:

> [N]ationally recognized clinical guidelines and resources, such as Level of Care Assessment Tool (LOCAT), American Society of Addiction Medicine's Patient Placement Criteria for the Treatment of Substance Related Disorders, Second Edition Revised (ASAM PPC-2R), Applied Behavioral Analysis (ABA) Guidelines for the treatment of Autism Spectrum Disorders, and Clinical Policy Bulletins available at http://www.aetna.com/cpb/cpb_menu.html, as well as plan benefit documents to support these coverage decisions.[28]

Specifically, Aetna noted that in reviewing C.'s continued stay at ICH, it "used the Level of Care Assessment Tool (LOCAT) guidelines for residential treatment."[29]  In its adverse determinations Aetna explained that the clinical criteria upon which Aetna's decision was based was available free of charge upon request.[30]

---

[28] AR 39.

[29] AR 39.

[30] AR 40.

6.    Aetna provided a discussion of its decision.

Finally, "[i]n the case of a notice of final internal adverse benefit determination, this description must include a discussion of the decision."[31]  As described above, Aetna explained the specific reason for the adverse determination and referenced the specific Plan provisions on which the denials were based.  Aetna further tendered a "discussion of the decision" when it invited Plaintiffs to call Member Services with any additional questions.[32]  Thus, Aetna complied with the requirement to "include a discussion of the decision" in its final internal adverse benefit determination.[33]

Moreover, any arguable deviation from this regulatory requirement was *de minimus* and did not harm Plaintiff.  It was, as the regulations allow, in the context of an ongoing, good faith exchange of information between Aetna and the claimant.[34]  In summary, contrary to Plaintiffs' arguments, there is no basis to modify the arbitrary and capricious standard of review that the Plan's discretionary language dictates should be applied.

## III.   AETNA'S DECISION TO DENY BENEFITS BEYOND JULY 12, 2018, WAS NOT AN ABUSE OF DISCRETION, BUT INSTEAD WAS PROPER UNDER ANY STANDARD OF REVIEW.

It is Plaintiffs' burden to prove that Aetna's decision to deny benefits beyond July 12, 2018, was an abuse of discretion.  *See LaAsmar*, 605 F.3d at 800.  Plaintiffs have made no such showing.  Instead, Aetna's decision to deny benefits beyond July 12, 2018, is supported by abundant evidence in the record, including C.'s medical records, record reviews by an Aetna

---

[31] 29 C.F.R. § 2590.715-2719 (b)(2)(E)(3).
[32] AR 42.
[33] 29 C.F.R. § 2590.715-2719 (b)(2)(E)(3).
[34] *See* 29 C.F.R. § 2590.715-2719(b)(2)(ii)(F)(2).

reviewer who is a licensed clinical social worker, clinical reviews by four different Aetna medical directors, each of whom concluded that continued treatment was not medically necessary, and by an independent external medical reviewer who is also a child and adolescent psychiatrist, and who made the same clinical judgment as the Aetna medical directors. Although C.'s symptoms were sufficiently severe for Aetna to approve his admission to ICH, by July 12, 2018, his symptoms had improved to a degree that intensive outpatient therapy was the medically necessary level of care.

A.     **C.'s Continued Treatment at ICH was Not Medically Necessary.**

C. was brought to ICH by his parents after having recently been expelled from school for kicking a teacher and throwing things. He showed physical aggression toward others, and had a long history of aggression and behavioral discontrol at home and school. His symptoms were escalating at that time. C. would constantly act out physically and verbally and then get depressed afterward. The treatment plan from ICH included mood stabilization, medication management, working on coping skills, and improving the family dynamic. Based on the foregoing Aetna approved C.'s admission to ICH for a month. A key element to C.'s admission to ICH was his constant physical aggression, which included kicking a teacher, throwing things, and acting out physically toward peers.

While the LOCAT guidelines are simply guidelines that are helpful to medical reviewers and not controlling, it is clear that Aetna's reviewers properly applied LOCAT in this instance. As Plaintiffs note in his motion for summary judgment, under LOCAT dimension 1 section D, titled Irritability/Aggression/Mania, an RTC level of care is suggested when the patient demonstrates the following:

> Intense inappropriate arguments occur almost continuously; and/or arguments occur almost daily and involve periodic physical confrontation and/or violence but without the use of an implement or weapon; or grandiose or impaired judgment, or markedly increased activity level; or severe psychosis impairing functioning.[35]

At the time of admission, it was reported to Aetna that C. had been brought to the facility after being expelled from school for kicking a teacher and throwing things.  He reportedly had a lot of physical aggression towards others and behavioral discontrol at home and in the school.  According to his parents, C.'s symptoms were escalating.  However, it was reported that C. had no suicidal or homicidal ideation, and no history of suicidal or homicidal thoughts.  It was reported that C. would act out physically and verbally and then get depressed afterward.  He had a history of aggression toward peers, but no fire setting, no cruelty to animals, and no enuresis.  Based on this information, Aetna approved C.'s admission and ultimately approved his stay for a period of thirty days.  During that time, Aetna performed ongoing reviews to determine whether the continued stay criteria were met and whether his continued stay was medically appropriate.

       1.      <u>Licensed professional counselor Barlow properly concluded that C.'s continued stay at ICH was not medically necessary.</u>

In a review conducted on June 26, 2018, Aetna reviewer Synthia Barlow, a licensed professional counselor, noted that C.M. presented with verbal aggression, noncompliance, interrupting, avoiding, low mood, sexualized behaviors, disruptive behaviors, pushing limits, blurting out and demanding attention.  But Barlow also noted that C.M. was making some improvements at ICH, including accepting some adult feedback, being compliant at times,

---

[35] AR 11611.

working on being respectful, and doing better with structure.  Based on her review Barlow approved an additional nine days of inpatient treatment at ICH.[36]

On July 5, 2018, Barlow performed another review of C.'s status and condition.  In her review she noted that C. "continues to present with a lot of verbal aggression, noncompliance, interruptive, tantrums avoiding, low mood, sexualized behaviors, disruptive, pushes limits, blurts out and demands attention, needs redirection, some sleep disturbance."[37]  In addition, however, it was noted that C was "making some improvement, accepting some adult feedback, can be compliant at times, working on being respectful, doing better with structure."[38]  Based on her review, Barlow approved C.'s stay for another seven days.[39]

Barlow performed another review on July 12, 2018.  During this review, she noted that there was no suicidal or homicidal ideation, no audio or visual hallucinations or psychosis, and no depression or anxiety.  Barlow noted that C. still acted out verbally, showed some defiance, needed some redirection, and continued to struggle with trusting adults and being accountable for his actions.  Barlow noted that C. had "shown the ability to be able to accept and tolerate adult support, but will often struggle to tolerate structure, pushes limits and boundaries but can be redirected with no issues, can be respectful of adult expectations but he fluctuates."[40]

Based on her review, Barlow concluded that C. no longer met the level of care requested based on LOCAT criteria because C. did not show suicidal ideation, homicidal ideation, psychosis, or physical aggression meriting the RTC level of care. Barlow noted that C. does have

---

[36] AR 29.
[37] AR 25.
[38] AR 25.
[39] AR 26.
[40] AR 23.

some continued verbal aggression, but also noted that he was medically stable and there had been no medication changes for mood.[41]  C. had learned coping skills with improved mood and had parents who were very supportive.[42]  Accordingly, Barlow concluded, as of July 13, 2018, C.'s treatment needs could be safely and effectively treated at a lower level of care.[43]  This conclusion was supported by the fact that C.' level of aggression no longer suggested RTC as the medically necessary level of care.

2.     <u>Dr. Schneider's review also supports Aetna's denial</u>.

Having made this determination, the claim was then sent to Dr. Alan L. Schneider, MD, DFAPA,[44] FASAM,[45]an Aetna medical director.  Dr. Schneider reviewed the claim file and medical records.  Dr. Schneider concluded that the RTC stay was no longer medically necessary, and that the recommended alternative level of care was intensive outpatient therapy ("IOP").[46] Specifically, Dr. Schneider noted that C. did not meet the following criteria for RTC level of care, "has level of irritability that results in intense inappropriate arguments that occur almost continuously."  Thus, the primary basis supporting C.'s admission to ICH was no longer present at a degree that required continued residential treatment.

Dr. Schneider's finding is consistent with LOCAT continued stay criteria.  Under Dimension 1(D), Irritability, IOP is recommended as medically necessary when there exists "[d]aily or frequent inappropriate arguments with other people, without physical violence."[47]  As

---

[41] AR 22.
[42] AR 22.
[43] AR 22.
[44] Distinguished Fellow of the American Psychiatric Association.
[45] Fellow of the American Society of Addiction Medicine.
[46] AR 21.
[47] AR 11611.

of July 12, 2018, C. engaged in some inappropriate arguments, however, there was no evidence

that these frequent arguments were accompanied by physical violence.  Accordingly intensive

outpatient therapy as suggested by Dr. Schneider was the proper level of care.

                3.       <u>Dr. Ray's conclusions support Aetna's denial</u>.

On July 17, 2018, Melissa from ICH called Aetna to request a peer-to-peer call regarding

C.'s claim.[48]  Aetna medical director Dr. Katherine Ray, MD, spoke with a therapist at ICH

named Ashley.  The two discussed C.'s history and status at ICH.  C. was an 11-year-old boy

admitted to ICH on June 14, 2018, to address symptoms of aggression after having been expelled

from school.  C. had a prior history of aggression and multiple mental health interventions.  His

diagnoses included disrupted mood dysregulation disorder, attention deficit hyperactivity

disorder, and anxiety disorder.  Ashley informed Dr. Ray that C. had been doing better until a

few days ago when he kicked a staff member when told "no".  Dr. ray mentioned that given C.'s

age and constellation of symptoms, it did not appear that a 24/7 level of care was medically

necessary, and that C. could safely be treated in a less restrictive setting such as IOP.  Dr. Ray

noted that since his admission, C. had made some progress and had appeared to stabilize with

regards to acute symptoms on admission.  She further noted that C. did not exhibit any suicidal

ideation, homicidal ideation, or psychosis, and ICH had provided no medication changes.

Notably, C. lived with his biological parents who were engaged in treatment and supportive.

Based upon the foregoing information, Dr. Ray concluded that although ICH suggested

continued treatment, there did not appear to be symptoms requiring the 24/7 level of care that

---

[48] AR 18.

ICH provided.[49]  Dr. Ray's clinical judgment was consistent with his application of the LOCAT

continued stay criteria as follows:

> Dimension 1: Acute Dangerousness
> > A. Suicide risk: supports _OP_ as the medically necessary level of care
> > B. Self-injury: supports _OP_ as the medically necessary level of care
> > C. Risk to others: supports _OP_ as the medically necessary level of care
> > D. Aggression: supports _IOP_ as the medically necessary level of care
>
> Dimension 2: Functional Impairment: supports _IOP_ as the medically necessary level of care
> Dimension 3: Mental Status and Comorbidities: supports _OP_ as the medically necessary level
> Dimension 4: Psychosocial Factors: supports _OP_ as the medically necessary level of care
> Dimension 5: Additional Modifiers: supports _IOP_ as the medically necessary level of care
> Dimension 6: Global Indicators: these are met _N_(Y/N).  Global indicators: these are met _N_(Y/N) and at least one of the following: The intensity of service being delivered is appropriate _N_(Y/N) Complications arising from treatment _N_(Y/N) Need for continued observation _N_(Y/N) Persistence of symptoms such that continued observation or treatment is required _N_(Y/N) Increased risk of complications _N_(Y/N) Additional time in treatment will reduce the probability of re-admission _N_(Y/N)[50]

Clearly Aetna did not cherry pick portions of the record or ignore C.'s medical records or

ICH's suggestion that C. should remain in residential treatment at ICH.  Nor did Aetna

selectively rely on only some evidence.  Rather, Dr. Ray acknowledged ICH's conclusion that

care at ICH continue, but disagreed with its conclusion based on her own review of the record.

Dr. Ray concluded that C.'s symptoms did not require an inpatient level of care.  That conclusion

was consistent with application of LOCAT.  At the time of the review, C.'s aggressive symptoms

had resolved to the degree that he met an IOP level of care, not an RTC level of care.

---

[49] AR 19.
[50] AR 18.

4.   <u>Four Aetna psychiatrists and an independent external review all support Aetna's denial</u>.

There can be no question that Aetna properly used its discretionary authority in reviewing C.'s claim for inpatient RTC coverage at ICH.  Aetna initially approved C.'s treatment at ICH in accordance with Aetna's LOCAT criteria.  A month later, after multiple concurrent reviews, Aetna determined that C.'s symptoms had lessened sufficiently, specifically in terms of physical aggression, such that an RTC level of care was no longer medically necessary, and that treatment could be safely and effectively continued in an intensive outpatient setting.  Not only did the Aetna's reviewer determine that the stay was no longer medically necessary, but two additional Aetna medical directors, both of whom were psychiatrists, reviewed the claim information and medical records and each independently reached the same conclusion.  Similarly, an independent external reviewer also came to the same conclusions, that based on a review of C.'s symptoms as of July 13, 2018, he could have been treated at a lower level of care.  Aetna's denials are consistent with LOCAT and the evidence contained in the record.  Thus, substantial evidence in the record supports Aetna's benefits determinations.

5.   <u>Plaintiffs' use of *Wit* is inapposite</u>.

Plaintiffs' citation to *Wit v. United Healthcare*[51] is unhelpful.  First, Plaintiffs' citation is to "Findings of Fact and Conclusions of Law" entered by a magistrate judge in the Northern District of California.  It is in no way authoritative to this Court.  Moreover, the language Plaintiffs' quote from *Wit*[52] relates to *Wit's* analysis of residential treatment in relation to

---

[51] *Wit v. United Behavioral Health*, Case No. 14-cv-02346-CS, 2019 WL 1033730 (N.D. CA March 5, 2019) (*unpublished*).
[52] Pls.' Mot., p. 34.

substance use disorders, not mental health.[53]  Specifically, the analysis from *Wit* criticizes United

Behavioral Health's medical necessity guidelines as not in keeping with the ASAM[54] criteria.

Here, however, C.'s symptoms and diagnoses did not involve substance abuse.  Therefore, the

information from *Wit* relating to substance use medical necessity criteria and ASAM is simply

irrelevant.

Equally important, *Wit* analyzed United Behavioral Health's medical necessity criteria,

not Aetna's, and there is no evidence that Aetna's criteria, even if they were applicable to

substance use disorders (they are not) suffer the same problems as United Behavioral Health's.

Simply put, *Wit* did not involve either the Plan or the LOCAT criteria.  Finally, unlike here, the

plaintiffs in *Wit* asserted a claim for breach of fiduciary duty based on United's alleged failure to

prepare and apply appropriate medical necessity criteria.  The *Wit* court reached its conclusions

only after a 10-day bench trial.  Here, in contrast, Plaintiffs assert only a benefits claim under 29

U.S.C. § 1132(a)(1)(b).  And as Plaintiffs well know, the Court's review of such claims is

limited to the administrative record.[55]  Plaintiffs' have not challenged Aetna's LOCAT

guidelines.  There is certainly no evidence in the administrative record to support a challenge to

LOCAT as improper medical necessity criteria.  Accordingly, *Wit* is inapposite.

## B.    Aetna Did Not Ignore the Opinions of C.'s Treating Professionals.

Plaintiffs argue, incorrectly, that Aetna failed to engage with the opinions of C.'s treating

professionals.[56]  As demonstrated above, however, this is simply not true.  Aetna Medical

---

[53] *Wit,* 2019 WL 1033730 at *16.
[54] American Society of Addiction Medicine.
[55] *Adamson v. Unum Life Ins. Co. of Amer.*, 455 F.3d 1209, 1212 (10th Cir. 2006) ("In ERISA cases, our review is confined to the administrative record.")
[56] Pls.' Mot., p. 35.

Director Dr. Ray not only acknowledged ICH's recommendations, but she held a peer-to-peer call with Ashley, C.'s therapist at ICH, to discuss the claim and Aetna's denial of continued benefits.  In addition, during C.'s initial stay at ICH, Aetna reviewer Barlow, a licensed professional counselor, analyzed records on multiple occasions and spoke to individuals at ICH to discuss C.'s ongoing status and treatment.

Plaintiffs submitted a level one appeal and Aetna analyzed the documents submitted with the appeal and requested a review by another medical director, Dr. Roomana Sheikh, M.D., who is also board certified in adolescent and child psychiatry.  Dr. Sheikh noted that during the dates of service at issue, after July 12, 2018, there was "no reported dangerousness toward self or others.  [C.] continued to present with irritability & verbal aggression, and occasional outbursts."[57]  C.'s symptoms were not as severe as they were at the time of admission to ICH. Dr. Sheikh also applied the LOCAT guidelines and concluded that Dimension 1(D): Aggression: supports IOP as the medically necessary level of care.  She also concluded that Dimension 2: functional impairment, Dimension 3: mental status and comorbidities, and Dimension 4: psychosocial factors also supported IOP.  According to Dr. Sheikh, the remaining Dimension supported standard outpatient therapy as the medically necessary level of care.  Based on her clinical judgment and application of LOCAT, Dr. Sheikh concluded that the record provided "no compelling indication for care in an inpatient setting during this time, or that care could not reasonably continue safely and effectively in an ambulatory setting."[58]

---

[57] AR 110.
[58] AR 110.

When Plaintiffs filed their second level appeal and included additional medical records, treatment history, and letters supporting C.'s treatment at ICH, Aetna Medical Director Dr. Basil Bernstein, M.D., board certified in Adult Psychiatry and Child and Adolescent Psychiatry, performed another review of the record. Dr. Bernstein concluded that for dates under consideration there was no reported dangerousness toward self, or others. C. continued to present with irritability and verbal aggression, and occasional outbursts, but there were no reported issues with sleep, or appetite and C.'s social interactions did not indicate "significant issues" with others.[59]  C. was reportedly compliant with taking his medications and his parents were involved and engaged in treatment.  He was medically and psychiatrically stable as of July 13, 2018.  Moreover, C. denied suicidal and homicidal ideation, was not evidencing psychotic thought processing, and was not exhibiting mania or incapacitating depression.  He attended adequately to his activities of daily living, and he was attending scheduled treatment activities. C. did not require special risk precautions for behavior.  Based on his review, Dr. Bernstein agreed with the other clinical reviewers that IOP was the medically necessary level of care after July 12, 2018.[60]

In upholding its denial on the level two appeal, Aetna noted that it had reviewed all available information, including; (1) the level two appeal request, (2) the level one appeal determination, (3) the original claim determination, (4) the authorized representative form, (5) the protected health information authorization form, (6) the progress notes, (7) the patient care

---

[59] AR 111.
[60] AR 11 – 112.

notes, (8) the diagnostic results, (9) the consultation notes, (10) the submitted medical notes, and (11) the Plan document governing benefits.[61]

Plaintiffs do not and cannot cite any evidence in the record to support the conclusion that Aetna ignored the medical records or ICH's conclusions.  Rather, Plaintiffs do not like the clinical results the Aetna and independent reviewers reached.  Yet it is well-established that claim administrators are not required to "accord special weight to the opinions of a claimant's physician, nor may courts impose on administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."[62]  And the Tenth Circuit has explicitly declined to depart from this *Black & Decker* holding in the context of "ERISA claims relating to mental health care."[63]

Nothing in the record suggests Aetna ignored anything, let alone the recommendations of C.'s treating providers, or evidence that supported his need for continued treatment.  In fact, all the reviewers agreed that C. needed continued treatment.  They simply disagreed about the intensity of care that was medically necessary.  Upon admission, C. was verbally and physical aggressive.  As of July 12, 2018, he was no longer so.  His symptoms had improved and become less extreme.  C. continued to have some outbursts, but as of this time his symptoms had

---

[61] AR 4045.

[62] *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

[63] See *Eugene S. v. Horizon Blue Cross Blue Shield of New Jersey*, 663 F.3d 1124, 1135 (10th Cir. 2011); see also *Mary D. v. Anthem Blue Cross Blue Shield*, 778 F. App'x 580, 593 (10th Cir. July 15, 2019)  (holding that the claim administrator was not required to defer to the opinions of Plaintiffs' treating physicians "in the face of other credible evidence," such as the opinions of two internal physician reviewers and an independent expert reviewer); *Carlo B. ex rel. C.B. v. Blue Cross Blue Shield of Massachusetts*, 2010 WL 1257755, *5 (D. Utah Mar. 26, 2010) (Jenkins, J.) (noting that Blue Cross is not obligated "to defer to a treating physician's choice of treatment options or evaluation of which course of treatment is 'medically necessary'").

improved to such a degree that he could have been safely and effectively treated at an IOP level of care.

### C.   Aetna Properly Applied the Terms of the Plan to the Record.

In its responses to both appeals, Aetna quoted the Plan language relating to Medically Necessary and explained that based on LOCAT guidelines, and the reviewers' respective medical judgments, C.'s continued stay at ICH was not medically necessary.  Aetna explained that one of the major factors in C.'s admission was his level of aggression, both verbal and physical.  As of July 12, 2018, C.'s aggression had decreased to such a level that he no longer needed 24-hour care.  Rather, four different Aetna Medical Directors, all of whom were trained psychiatrists with specializations in child and adolescent psychiatry, determined that the medically necessary level of care for C.'s symptoms was IOP care.

Importantly, the independent medical reviewer, also board certified in child and adolescent psychiatry, and who also analyzed C.'s medical records in connection with LOCAT admission and continued stay criteria, reached the same clinical result—that the medically necessary level of care after July 12, 2018, was IOP treatment.  After quoting the Plan's definition of Medical Necessity, the Independent Reviewer concluded there were no clinical circumstances unique to C. that would make his continued stay at ICH medically necessary based on both the Plan definition and current medical literature.

All of the foregoing evidence demonstrates that Aetna's decision is, at a minimum, supported by substantial evidence in the administrative record.  Not only did four Aetna psychiatrists find evidence to support its decision, but so did an independent external reviewer.

Accordingly, the Court should deny Plaintiffs' Motion for Summary Judgment and grant

Defendants' Cross-Motion for Summary Judgment thereby dismissing this case with prejudice.

## V.    THE COURT SHOULD DENY PLAINTIFFS' CLAIM FOR PREJUDGMENT INTEREST AND ATTORNEY FEES.

### A.    Plaintiffs' Attorney Fee Claim is Improper.

Plaintiffs cannot simply claim entitlement to attorney fees.  Rather, as explained in *Hardt*

*v. Reliance Standard Life Ins. Co*., "a fees claimant must show 'some degree of success on the

merits' before a court may award attorney's fees under §1132(g)(1).'"[64]  Here, the Court should

not award attorney fees because Plaintiffs have not achieved any success on the merits.  Aetna's

denial was reasonable and supported by the evidence in the administrative record.  Thus, the

Court should deny Plaintiffs' requests for fees without further analysis.

Nevertheless, even if Plaintiffs could show some success on the merits, the Tenth

Circuit—like other circuits—has adopted certain non-exclusive criteria in determining an award

of attorney's fees.  These criteria were set forth in *Gordon v. United States Steel Corp*.,[65]  and

remain applicable:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the
> opposing parties to personally satisfy an award of attorney's fees; (3) whether an award
> of attorney's fees against the opposing parties would deter others from acting under
> similar circumstances; (4) whether the parties requesting fees sought to benefit all
> participants and beneficiaries of an ERISA plan or to resolve a significant legal question
> regarding ERISA; and (5) the relative merits of the parties' position.

Applied to the present case, Plaintiffs are not entitled to attorney fees.

---

[64] *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 255 (2010) (citing *Ruckelshaus v. Sierra Club,* 463 U.S. 680, 694 (1983).
[65] *Gordon v. United States Steel Corp.*, 724 F.2d 106, 109 (10th Cir. 1983).

Under the first element, Defendants have no culpability or bad faith.  "To infer bad faith, the courts require more than a showing that the opposing party's position is incorrect and usually require that it is totally without merit."[66]  As shown above, Defendants' actions are in conformity with the language of the Plan and the law, and their decisions were reasonable and supported, at a minimum, by substantial evidence in the administrative record.  Culpability cannot attach to a claims fiduciary for merely following the Plan.  Because there is no evidence that Defendants acted inappropriately, let alone in bad faith, the Court should deny Plaintiffs' request for attorney fees.

Addressing the second element, although it may seem apparent that Defendants could pay an award of attorney fees, there is no evidence in the record at this point on that issue.   Absent such evidence, an award against Defendants would be improper.[67]  Moreover, assuming there was such evidence in the record, this alone is an insufficient basis on which to grant an award.[68]

The third element goes to the deterrent effect, if any, such an award would have on others acting in similar circumstances.  Aetna properly denied benefits that were not medically necessary.  Since Defendants' conduct was not an abuse of discretion, an award of attorney fees would have no deterrent effect on wrongful conduct of others.[69]

The fourth element asks whether a novel legal question is involved, or whether Plaintiffs' action seeks to benefit all participants. This case does not present a novel legal question.  Rather,

---

[66] *Krogh v. Chamberlain*, 708 F. Supp. 1235, 1240 (D. Utah 1989).
[67] *Id.* at 1240–41.
[68] *See, e.g.*, *Grohowski v. U.E. Sys., Inc.*, 917 F. Supp. 258, 262 (S.D.N.Y. 1996) ("[W]hile it is likely that defendants could afford to pay plaintiffs' fees, this factor is far from dispositive.").
[69] *Id.*

it is a standard 29 U.S.C. § 1132(a)(1)(B) claim seeking benefits for a minor child's inpatient stay at a residential treatment facility.  Neither Plaintiffs' claim nor their argument is novel.

The final element directs the Court to consider the relative merits of the parties' positions.  Under an abuse of discretion standard of review, the evidence in the administrative record fully supports Defendants' position that Plaintiffs' benefits were properly denied.  Consequently, the scale overwhelmingly tips in Defendants' favor on this element.  However, even if the Court were to apply a *de novo* standard of review, the fact that Defendants acted in accordance with the language of the Plan and complied with ERISA's procedural requirements further tips the scale in Defendants' favor.  For these reasons, there is no merit to Plaintiffs' claim for attorney fees.  It should be denied.

### B.    Plaintiffs' Claim for Pre-Judgment Interest is Also Improper.

Plaintiffs contend that prejudgment interest is appropriate.  However, whether prejudgment interest is appropriate is a two-step process involving assessments of whether such an award will fairly compensate an injured party as well as "whether the equities would preclude the award."[70]  And even where an award of prejudgment interest is appropriate, the Court must still calculate when it begins to accrue as well as the appropriate rate.[71]  The Tenth Circuit has "held squarely that punitive damages are not available in an ERISA action" and an "excessive prejudgment interest rate [that] would overcompensate an ERISA plaintiff, thereby transform[s] the award of a prejudgment interest from a compensatory damage award to a punitive one."[72]

---

[70] *Caldwell*, 287 F.3d at 1286.

[71] *See id*. at 1287–88.

[72] *Allison v. Bank One-Denver*, 289 F.3d 1223, 1243 (10th Cir. 2002) (citations omitted).

Given that Aetna's claims determination was appropriate, an award of prejudgment interest is inappropriate and should be denied.

## **CONCLUSION**

Based on the foregoing, the Court should deny Plaintiffs' motion for summary judgment. Defendants' decision was reasonable and supported by the record and multiple clinical reviewer psychiatrists specializing in child and adolescent psychiatry as well as an equally qualified independent external reviewer.

DATED this 10th day of August 2021.

 /s/ David N. Kelley
Scott M. Petersen
David N. Kelley
Fabian VanCott
*Attorneys for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 10th day of August 2021 a true and correct copy of the

foregoing **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'**

**MOTION FOR SUMMARY JUDGMENT** was served via the court's electronic filing system

on the following:

> Brian S. King
> brian@briansking.com
> Brent Newton
> brent@briansking.com
> Samuel Hall
> samuel@briansking.com
>
> *Attorneys for Plaintiff*

/s/ David N. Kelley