Brian S. King, #4610
Brent J. Newton, #6950
Samuel H. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

## THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BRUCE M., individually and on behalf of C. M. a minor,<br><br>       Plaintiffs,<br><br>vs.<br><br>AETNA LIFE INSURANCE COMPANY, and the MARSH & McLENNAN COMPANIES HEALTH & WELFARE BENEFITS PROGRAM.<br><br>       Defendants. | **PLAINTIFF'S OPPOSITION MEMORANDUM TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:20-cv-00346 DBB-DBP<br><br>Judge David B. Barlow<br><br>Magistrate Judge Dustin B. Pead |

Pursuant to Local Rule 56-1(c), Plaintiff Bruce M. ("Bruce") hereby submits his

Memorandum in Opposition to Aetna Life Insurance Company (Aetna") and the March &

McLennan Companies Health & Welfare Benefits Program (the "Plan") collectively referred to

as Defendants' Motion for Summary Judgment.

//

# INTRODUCTION

When C. required residential treatment to address his serious behavioral problems caused by multiple mental health conditions, Bruce was pleased when Aetna agreed to provide coverage for his child's care. That feeling was short lived because after a month Aetna denied further coverage, claiming that C. no longer met the criteria for care at a residential treatment center and that he could be treated at a lower level of care.

In response to Aetna's decision to deny coverage, Bruce twice appealed that decision to Aetna and once to an external reviewer. Bruce provided Aetna and the external reviewer with medical records, evaluations, and written letters supporting the medical necessity of C.'s ongoing residential treatment center level of care. In his Motion for Summary Judgment Bruce argued why Aetna's decision was wrong and why C.'s treatment was medically necessary as defined by the terms of the Plan.

But having reviewed Defendants' Motion for Summary Judgment, Bruce has identified a continuing trend. In support of its decision to deny benefits Aetna ignores the facts that are contained in the medical record and relies on its own unsupported conclusions. Aetna then contends that because multiple reviewers reached the same conclusion, this Court should affirm its decision to deny benefits. But in making this argument, Aetna conflates the process of claim evaluation with its conclusory decision to deny benefits. Aetna's reasoning is circular in that it claims its decision was right because it said it was right.

While Bruce does not dispute that the plan documents contain language that could convey discretionary authority, Bruce still contends that Aetna's decision-making process lacked a meaningful dialogue in the context of an ongoing good faith exchange of information. That

type of failure should cause Aetna to forfeit any deference and result in a *de novo* standard of review. But regardless of the standard of review, Aetna's decision to deny benefits was neither right nor supported by substantial evidence. Aetna reached its decision by ignoring the medical record and it never acknowledged why it deviated from the good clinical judgment of C.'s treating providers.

Aetna was correct when it initially covered the costs of C.'s treatment. Where Aetna went astray was deciding to arbitrarily deny benefits when C. continued to demonstrate the same behaviors that justified coverage during the first month of stay. Even under a deferential standard of review Aetna's decision to deny benefits in the face of unchanging circumstance was arbitrary and capricious and must be reversed.

## PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

Consistent with Local Rule DUCivR 56-1(c)(3) Plaintiff responds to Defendants' Statement of Undisputed Facts. Plaintiff will only reproduce and respond to the facts for which there is a genuine dispute of material facts.

## DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

4.      Aetna, as the applicable Claims Administrator, "has full discretion and authority to make all such claims/benefits determinations."  PLAN084

**Plaintiff's Response:**  While this fact accurately reproduces language from the Benefit Handbook, the handbook goes on to state the following:

> Unless the Plan Administrator has delegated such authority to a Claims Administrator or Account Administrator, the Plan Administrator shall have compete [sic] authority to interpret and construe the provisions of the plans, make findings of fact, correct errors, and supply omissions. All decisions and interpretations of the Plan Administrator made pursuant to the plan shall be final,

conclusive, and binding on all persons and may not be overturned unless found by a court to be arbitrary and capricious. [PLAN 84]

6.     Benefits are only paid for medically necessary charges for "specified

wellness care expenses."  Moreover, "some services have specific limitations or

restrictions."  PLAN013

**Plaintiff's Response:** The Plan does contain certain exclusions for **"Mental Health/Substance**

**Abuse"** services but because Aetna initially approved coverage for C.M.'s care at ICH, those

limitations do not apply to the coverage issue in this case. [PLAN 64-65]

7.     Certain medical expenses require preauthorization, including inpatient Hospital,

Rehabilitation Facilities, Residential Treatment Facilities, and Skilled Nursing Facilities.

PLAN020

**Plaintiff's Response:**  While this fact accurately reproduces language from the Benefit

Handbook, the handbook goes on to state the following:

> If you fail to obtain preauthorization, your out-of-network benefits will be reduced by
>
> $400 of covered expenses for inpatient hospital, treatment facility, skilled nursing
>
> facility, home health care, private duty nursing and hospice.

Additionally, Aetna initially approved coverage for C.M.'s care [PLAN 22; Rec. 60-62]

**C.M.'s Admission to ICH**

13.     On June 13, 2018, C.M., then age 11, was admitted to Intermountain Children's

Home ("ICH").  AR 22 & 60-62

15.     At the time of admission C.M. had just been expelled from school for kicking a

teacher, throwing things, and showing a lot of physical aggression towards others, and his

symptoms were reportedly escalating.  AR 30

**Plaintiff's Response:** The ICH client summary at admission also described C.M.'s prior treatment history that resulted in C.M.'s admission including the need for a previous hospitalization." [Rec. 1723]

16.     ICH noted that C.M. exhibited both verbal and physical aggression when he did not get his way.  He had a low frustration tolerance, was reactive, and easily triggered.  AR 1677-82

**Plaintiff's Response:** In the Presenting Problem section of C.M.'s admission summary, ICH documented that C.M. presented with little physical aggression in contrast to his behavior outside of a "controlled environment." [Rec. 1723]

17.     ICH's treatment plan for C.M. included, among other things, mood stabilization, medication management, increasing healthy coping skills, decreasing unhealthy coping skills, improving family dynamic, identifying internal emotional dynamics, family therapy, and group therapy. AR 30

**Plaintiff's Response:** This fact cites Aetna's summary of C.M.'s treatment plan. Copies of C.M.'s treatment plan in the medical record identifies C.M.'s diagnoses, problem areas and objectives. C.M.'s diagnoses included: Attention-deficit/hyperactivity disorder; Disruptive mood dysregulation disorder; Other specified anxiety disorder, other specified disruptive, impulse-control and conduct disorder. The treatment plans anticipated a length of stay for C.M. to be able "to express himself in safe and adoptive ways with peers in all environments." [Rec. 3174-3176, 5445-5449, 5612-5616, 5645-50]

18.     On June 15, 2018, C.M. purposely tripped a peer who was riding rollerblades.  He also argued with peers and adults, and needed physical intervention. AR 1693-97

**Plaintiff's Response:** The record also reflects that this was the first time that C. required a physical intervention or a hold at the treatment facility. [Rec. 1695]

**Benefits for C.M.'s Stay Denied Beyond July 12, 2018**

25. Another concurrent review was conducted on July 12, 2018, wherein the reviewer concluded:

- C.M. did not meet the level of care requested based on LOCAT criteria as well as no suicidal ideation, homicidal ideation, psychosis, or physical aggression.

- C.M. had some verbal aggression.

- C.M. was medically stable, and there had been no medication changes for mood.

- C.M. had learned coping skills with improved mood and had parents who were very supportive.

- C.M.'s treatment needs could be safely and effectively treated at a lower level of care such as a partial hospitalization program in his home area, or return to outpatient therapy with multiple weekly visits.

AR 22.

**Plaintiff's Response:** The LOCAT recommends coverage for residential treatment when the medical records document "[i]ntense inappropriate arguments occur almost continuously; and/or arguments occur almost daily and involve periodic confrontation and/or violence but without the use of an implement or weapon; or grandiose or impaired judgment, or markedly increased activity level; or severe psychosis impairing functioning." In C.'s case, the reviewer failed to indicate whether the Functional Impairment dimension was reviewed. This provision recommends residential treatment when there is either total or almost total withdrawal from all

situations, including social and occupational/educational, a near complete disruption of relationships, and an inability to attend school due to mental status. [Rec. 11611-11612]

28.     Dr. Schneider reviewed the claim and used LOCAT guidelines for residential treatment.  Based on LOCAT criteria and C.M.'s medical records, Dr. Schneider concluded that continued inpatient residential treatment was not medically necessary, and that C.M. could have been safely and effectively treated with intensive outpatient therapy. AR 21

**Plaintiff's Response:** The LOCAT is part of the record and the document speaks for itself. Plaintiff does not dispute that Dr. Schneider claimed to have used the LOCAT, but whether the LOCAT itself will confirm with the decision was consistent with its criteria. [Rec. 11603-11618]

29.     Dr. Schneider noted that C.M. did not meet the following criteria for continued inpatient residential treatment: "has a level of irritability that results in intense inappropriate arguments that occur almost continuously."  He concluded that treatment could be provided at a less intensive level of care or in another setting. AR 21

**Plaintiff's Response:** Dr. Schneider's log does not indicate what records were reviewed. Dr. Schneider made no mention of the July 5, 2018 psychiatric report that indicated that a residential treatment center was "the lowest level of care appropriate for C. at this time and with any less intensive environment or supervision, he could be at substantial risk for acute psychiatric hospitalization." [Rec. 21, 499] Dr. Schneider's report also notes that Aetna verified partial hospitalization programs at Aurora Psychiatric Hospital and Rogers Memorial Hospital, two programs where C. had been treated previously. [Rec. 21, 633-755, 758-787]

33.     On July 26, 2018, Dr. Ray spoke to C.M.'s therapist, Ashley, to discuss C.M.'s current status and needs and prepared the following notes regarding her discussion:

Member is 11 year old boy admitted to RTC 6/14/18 to address symptoms of aggression. Member lives with his biological parents in Georgia. Therapist is not sure what family therapy or other specific treatments were tried in the past but notes that member was sent to this program in Montana to work on behavioral issues, symptoms of ADHD, DMDD. Provider notes that Parents Skype once per week and after three months they usually visit. Member had been doing better until few days ago when he kicked a staff member when told "no". He was placed in hold which is their intervention. There is no SI HI or psychosis. No medical issues. Member is compliant w/ Prozac 60 mg qam. Guanfacine 3 mg qam. Not clear if mood stabilizing medication has been tried in the past. We reviewed that member's persistent behavioral issues are concerning; however, after over one month in RTC, member appears to have improved with one recent episode of kicking staff. Given member's age and constellation of symptoms, it does not appear 24/7 level of care is medically necessary; member could safely be treated in less restrictive setting IOP w consideration of case management and evidence based MST.

Medical Necessity Criteria: LOCAT: Continued stay:
- Dimension 1: acute dangerousness
  - Suicide risk: supports __OP__ as the medically necessary level of care
  - Self-injury: supports __OP__ as the medically necessary level of care
  - Risk to others: supports __OP__ as the medically necessary level of care
  - Aggression: supports __IOP__ as the medically necessary level of care
- Dimension 2: functional impairment: supports __IOP__ as the medically necessary level of care
- Dimension 3: mental status and comorbidities: supports __OP__ as the medically necessary level
- Dimension 4: psychosocial factors: supports __OP__ as the medically necessary level of care
- Dimension 5: additional modifiers: supports __IOP__ as the medically necessary level of care
- Dimension 6: global indicators: these are met __N__(Y/N).
- Global indicators: these are met __N__(Y/N) and at least one of the following:
  - The intensity of service being delivered is appropriate __N__(Y/N)
  - Complications arising from treatment __N__(Y/N)
  - Need for continued observation __N__(Y/N)
  - Persistence of symptoms such that continued observation or treatment is required __N__(Y/N)
  - Increased risk of complications __N__(Y/N)   Additional time in treatment will reduce the probability of readmission __N__(Y/N)

In my opinion, medical necessity for Residential Treatment Center level of care is not met.

AR 18

**Plaintiff's Response:** Plaintiff can find nothing in the record that indicates this information was provided to the Plaintiffs until this litigation. Further, for residential treatment the LOCAT does not require physical violence, rather it states, "periodic confrontation and/or violence but without the use of an implement or weapon." [Rec. 18, 11611]

34.     On July 31, 2018, ICH informed Aetna that although benefits had been denied, C.M. would remain inpatient with alternative funding. AR 17

**Plaintiff's Response:** Plaintiff finds nothing in the records that indicates this information was provided to the Plaintiff prior to this litigation. [Rec. 17]

**Plaintiff's Level 1 Appeal**

35.     In a letter dated January 2, 2019, Plaintiff appealed the denial of benefits for C.M.'s continued treatment at ICH. Plaintiff argued that C.M. met LOCAT's continued stay criteria. He provided a detailed history of C.M.'s behavioral difficulties from the time he was age 3 through age 11 and a history of C.M.'s prior treatment, which included a 3 week day treatment program in the fall of 2015, psychiatric hospitalization from 3/14/16-3/15/16, child day treatment from 3/16/16-4/25/16, psychiatric hospitalization from 8/10/16-8/16/16, day treatment, Rogers Memorial 7/5/17-8/21/17, and Northwest Passage from 2/26/18-3/27/18. AR 478-550

**Plaintiff's Response:** The appeal document speaks for itself but it also referenced Exhibits that contained the medical records at the facilities listed above.  Moreover, Plaintiffs submitted additional letters of medical necessity -

**August 6, 2018** -- Letter from Mark Batory, M.D., M.M who wrote that C. had been in his care since May 5, 2015 and that despite treatment compliance and multiple medications "remission of all significant symptoms and functional stability of 30 days or more has never

been achieved." Noting that C. was "the most challenging and heart-breaking patient I have ever treated," Dr. C. opined that [f]urther residential treatment is warranted." [Rec. 2300]

**August 13, 2018** - Letter from Dr. Terry Young, Psy.D., ABN, Board Certified Clinical Neuropsychologist. Dr. Young recommended that "long term residential treatment was clinically warranted" . . . and he "consider[ed] this to have been a medically necessary treatment course." [Rec. 2298]

**August 15, 2018** - Kim Nodolf, MA, LPC wrote a letter indicating that she had been C.'s outpatient therapist from August 2016 until he required a higher level of care in January 2018. The letter confirmed that with outpatient care C. would "put himself in situations where either he and'or other's safety was in danger. She wrote, "[C.] needs a residential level of care that provides more intensive and daily treatment. [Rec. 2296]

In addition to other documents and records, Bruce included the psychological evaluation from November and December 2017 that included as a recommendation a "residential program providing psychological and behavioral supports." Dr. Young further wrote: "it would be unlikely a short stay would be sufficient to alter the behavioral and emotional patterns established." [Rec. 1211-1218]

      3.      The level 1 appeal also provided a brief summary of C.M.'s medical records at ICH. AR 478-550

**Plaintiff's Response:** The "brief summary" included 55 pages of citations to the medical records. The appeal included Exhibit 25 which contained 1299 pages of medical records from which the citations in the appeal letter were taken as noted in footnote 32. [Rec. 491-549]

37.     Aetna analyzed the appeal, medical records, and other information provided by Plaintiff in support of his appeal. The appeal was reviewed by 1) Roomana Sheikh, an Aetna medical director who is board certified in adult psychiatry and adolescent and child psychiatry with a professional designation of MD, BH-MRT, 2) a senior complaint and appeal analyst, and a complaint and appeal analyst, none of whom were involved in the initial benefit denial. AR 110 & 428

**Plaintiff's Response:** These records show that the reviewer used a "generic template" to produce the letter that was sent to the family. There is nothing in the letter that indicates that the reviewer assessed or analyzed the letters of recommendation, the psychological evaluation, or any of the specific behavioral problems the family identified in their appeal letter beyond a bullet point that lists "medical records." [Rec. 110 and 428]

38.     Dr. Sheikh noted that C.M. entered treatment with symptoms and behaviors consistent with 1) conduct disorder, 2) disruptive mood dysregulation disorder, and 3) ADHD, combined type. She noted that C.M. had prior treatment interventions including inpatient and residential stays, and that during the dates of service there were no reports that C.M. was dangerous toward himself or others. C.M. continued to present with irritability, verbal aggression, and occasional outbursts. However, there were no problems with his sleep or appetite. His social interactions fluctuated between positive and negative, though there was nothing indicating significant issues or extreme behaviors. C.M. was compliant with taking medications, his parents were involved and engaged in treatment, and his records provide no compelling indication for care in an inpatient setting during this time, or that care could not reasonably continue safely and effectively in an ambulatory setting. AR 110 & 428

**Plaintiff's Response:** Dr. Shiekh provided no response to the recommendations from the previous treatment providers that confirmed that C. would need long-term care and that a short-term residential placement would be ineffective. The medical record included documentation of the same behaviors that Aetna identified to approve coverage initially. These behaviors were summarized by the family in their appeal letter at Rec. 491-549, and these quoted summaries are documented in the medical record from Rec. 1721-1960. [AR 110, 428]

41.     Based on its review of the appeal and accompanying documents, as well as the conclusions of the appeal reviewers and Dr. Sheikh, Aetna upheld its denial of benefits for C.M.'s stay at ICH beyond July 12, 2018. AR 428

**Plaintiff's Response:** Based on the specific recommendations from C. treatment providers included in Bruce's appeal, the language in the denial letter is insufficient to indicate that the entire appeal with the attached exhibits were evaluated. [Rec. 428, 478-550, 1211-1218, 2296-2300]

**Plaintiff's Level 2 Appeal**

42.     Plaintiff submitted a level 2 appeal dated April 30, 2019. He argued that use of LOCAT was inconsistent with generally accepted standards of medical practice and may infringe upon federal parity regulations.  He argued that the reviewer seemed to have forgotten the most crucial element of the first appeal, namely C.M.'s need for continued treatment.  He argued that residential treatment was the appropriate level of care for C.M., and that a lower level of care would likely result in maybe a month or two of success then admission to a psychiatric hospital when C.M. inevitably regressed to maladaptive behaviors and coping methods. AR 439-465

43.     Plaintiff also summarized additional medical records that he felt supported payment of benefits for C.M.'s continued stay at ICH. AR 439-465.

**Plaintiff's Combined Response to Facts 42 and 43:** Bruce included a full copy of the additional medical records from the time of the Level One appeal until the time of the Level Two appeal. He also included as a separate exhibit the selected medical records that he highlighted in the appeal. Finally, Aetna's description of the record that Plaintiff provided ignores the new letter of medical necessity from C.'s treatment providers at ICH. In that letter, Dr. A.K. Hash, DO, P.hD, and Ashley Van Dyke, MSW summarized C.'s treatment. They documented his ongoing verbal and physical aggression, low frustration tolerance, and his continued need for 24/7 supervision and therapeutic milieu treatment. [Rec. 439-465, 2001-2002, 4003-4041]

45.     Based on the information reviewed Dr. Bernstein noted that C.M. had prior treatment interventions including inpatient and residential stays. For the dates under consideration there was no reported dangerousness toward self, or others. He continued to present with irritability and verbal aggression, and occasional outbursts. There were no reported issues with sleep, or appetite. C.M.'s social interactions were not thought to indicate 'significant issues' with others. He was compliant with medications. His parents were involved and engaged in treatment. As of the date denial according to the information available about the C.M.'s condition, he was medically and psychiatrically stable, he denied suicidal and homicidal ideation, he was not evidencing psychotic thought processing, he was not exhibiting mania or incapacitating depression. C.M. was attending adequately to his activities of daily living and he was attending scheduled treatment activities. He did not require special risk precautions for

behavior. Accordingly, LOCAT did not support MH RTC level of care, but did support MH

Intensive Outpatient Program (MH IOP) level of care. AR 111 & 4045-48

**Plaintiff's Response:** Plaintiff is unable to find in Aetna's internal logs or its June 4, 2019,

denial letter any reference to any specific medical record or document that would confirm that

Aetna had reviewed the documents Bruce had provided as part of its appeal. In particular, there

is no reference to Dr. Young's recommendation that without long-term residential treatment C.'s

treatment would be ineffective and medically necessary to prevent regression. [*Id.*, Rec. 1218,

2298]

46.     Aetna noted that there was no immediate threat of deterioration in C.M.'s mental

status and he was not a danger to self or others if not in a residential treatment center level of

care. Inpatient residential treatment center care was required for active diagnostic evaluation and

treatment of an intensity that could be provided appropriately only in an RTC setting and C.M.'s

treatment did not require a 24-hour inpatient stay. AR 4045-48

**Plaintiff's Response:** Bruce does not dispute that this language appears in the record, but he

does dispute that the LOCAT requires each of those elements in order to qualify for a residential

treatment center level of care. [*Id.*; Rec. 11603-11618]

52.     According to the Independent Reviewer,

From 7/13/18-12/31/18, the LOCAT criteria was not met for MH RTC level of care. The
patient had some irritability and occasional verbal outbursts. The patient was not actively
suicidal, homicidal or psychotic. The patient was not physically aggressive. The patient
had adequate sleep and appetite. The patient was going to groups. The patient's family
was involved. The patient was [sic] not attempted to elope. The patient was not acutely
manic or sexually inappropriate. Through 12/31/18, the patient continued to have some
verbal outbursts, was disruptive in class and groups, acting inappropriate silly,
manipulative and testing boundaries. He blamed others for his mistakes. He had some
intermittent eposide [sic] of threatening to kill staff when upset, but was able to calm and
there is no indication of plan or intent. The patient was medication compliant. He was

able to work on some coping skills, but the patient's defiance and oppositional behavior was ongoing throughout. This appears to be more of a chronic behavior. Treatment could have been addressed at a lower level of care.

Therefore, the patient does not meet the Aetna's Level of Care Assessment Tool (LOCAT) criteria for coverage of mental health residential treatment center level of care from 7/13/18-12/31/18 and forward.

AR 5091-92

**Plaintiff's Response:** The independent review provided a brief chronological summary of C.'s behaviors. These behaviors are similar to what Aetna identified when it approved benefits. In Aetna's statement of facts numbers 21 and 22 above Aetna writes: "21. In another concurrent review, Aetna noted that C.M. presented with a lot of verbal aggression, noncompliance, interruptive, avoiding, low mood, sexualized behaviors, disruptive, pushed limits, blurted out and demanded attention, needed redirection, and experienced some sleep disturbance. AR 28-29 22. Aetna approved benefits for another nine days. AR 28-29." [Rec. 5089-5090]

## ARGUMENT

I. **AETNA IMPROPERLY IGNORES ITS FAILURE TO FOLLOW ERISA'S CLAIMS PROCEDURE REGULATIONS WHEN IT ASSERTS ITS RIGHT TO A *DE NOVO* STANDARD OF REVIEW BUT EVEN A DEFERENTIAL REVIEW RESULTS IN A REVERSAL.**

The Plaintiff and Defendants agree that this claim is governed by the rules of summary judgment that apply to denied benefit claims under ERISA.[1] And because the Parties have agreed to a prelitigation appeal record there is no "genuine dispute as to any material fact."[2] But Aetna's violations of ERISA's claims procedure regulations require a *de novo* review of its

---

[1] 24, p. 21; 25. p. 20-21
[2] ECF Doc. 24, p. 20, citing FedR.CivP. 56(a)

decision to deny benefits.[3] Aetna relies on language in the Plan documents that indicate Aetna had the discretion to determine eligibility of benefits.[4] But even with such language in the plan documents, Tenth Circuit precedent provides for a heightened standard of review under a variety of circumstances that apply to the facts of this case.[5]

As Plaintiff explained in his Motion for Summary Judgment, Aetna's shortcomings in the prelitigation process indicate that Aetna failed to engage in an ongoing and good faith exchange of information.[6] While Plaintiffs presented numerous documents and medical records, Aetna's denial letters do not demonstrate an application of facts in the medical records to its decision to deny benefits.[7] Because the documents and records Bruce provided were voluminous and covered extended periods of time, Bruce was not expecting a line by line explanation of why Aetna rejected the recommendations of C.'s treating clinicians. But Bruce did expect some kind of response or acknowledgement refuting the recommendations from letters of medical necessity written by both C.'s previous treatment providers as well as his providers at ICH.[8]

Had Aetna been engaging in an ongoing and good faith exchange of information, Aetna should have at least mentioned the letters of recommendation and provided some analysis as to why it disagreed with the treatment providers. In addition to letters supporting the medical necessity of C.'s ongoing care, Bruce provided a copy of C.'s psychological evaluation that also recommended long-term residential treatment based on C.'s inability to maintain effective

---

[3] ECF Doc. 24, 21-23; ECF Doc. 25, p. 20-27
[4] ECF Doc. 24, p. 22
[5] *Harvey T. v. Aetna Life Ins. Co.*, 508 F. Supp. 3d 1088, 1097-98 (D. Utah 2020) (citations omitted)
[6] Rec. 428-433, 4045-4050
[7] Rec. 39-43, 4045-48
[8] Rec. 2296-2300.

behavioral change when less intensive or shorter duration types of therapy were used. [9] That psychological evaluation was authored by Dr. Terry Young, the same provider who also wrote a letter of medical necessity as part of the Level One Member Appeal.[10]

A good faith exchange of information is an essential element if an insurer wants to claim substantial compliance with the claims procedure regulations so as to call for this Court's deferential review.[11] The contrast between Aetna's correspondence and Bruce's appeals reflects the absence of a good faith exchange of information. Where Bruce provided detailed medical records and several letters of medical necessity, Aetna responded with cursory and conclusory letters that failed to apply the underlying facts of C.'s treatment to its decision to deny benefits. These are not facts under which Aetna may claim substantial compliance with claim regulations.

A good faith exchange of information must include "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;" and for denials based on lack of medical necessity, "an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances."[12] In this review process, Aetna denial letters do not indicate that this took place. Instead the denial letters are more akin to conclusory statements that lack reasoned analysis based on the actual facts of the medical record.[13]

---

[9] Rec. 1211-1218
[10] Rec. 2298
[11] *Rasenack v. AIG Life Ins. Co.*, 585 F.3d 1311, 1317 (10th Cir. 2009)
[12] *Id.* § 2560.503-1(g)(i),(ii),(iii) and (v). *See also* Rec. 167
[13] Rec. 428-433, 4045-4050; *See also D.K. v. United Behavioral Health*, 2021 U.S. Dist. LEXIS 117501, at *38 (D. Utah June 22, 2021)

The regulations also provide that if an administrator fails to comply with these minimum requirements "the claim or appeal is deemed denied on review *without the exercise of discretion by an appropriate fiduciary*" unless the procedural violations are "de minimis," occurred "for good cause or due to matters beyond the control of the plan or issuer," and do not cause prejudice or harm to the claimant.[14] Aetna has failed to demonstrate that it was beyond its control to conduct a full review of the medical record and to provide a meaningful explanation that took into account the facts that the family provided in their appeal.

Because the good faith exchange of information is requisite to a claim of substantial compliance and Aetna did not provide a proper explanation of why the facts of the case resulted in a denial of benefits, it forfeits its right to a deferential review. But even if this Court applies a deferential standard of review, the decision to deny benefits was arbitrary and capricious. Recently another court in this district opined on the effect when an insurer presents only conclusory statements regarding the denial of benefits in its denial letters. "Because [the insurer's] denial letters repeatedly failed to indicate that they considered [the patient's] treating physician opinion at all, the court finds that Blue Cross's decision violated ERISA's procedural safeguards and must therefore be reversed."[15] Consequently, even under an arbitrary and capricious standard of review Bruce is entitled to a reversal of the decision to deny benefits and a judgment in his favor.

//

//

---

[14] 29 C.F.R. § 2590.715-2719(b)(2)(ii)(F)(1)-(2) (emphasis added).
[15] *Scott M. v. Blue Cross & Blue Shield of Mass*, 2021 U.S. Dist. LEXIS 57101, at *39 (D. Utah Mar. 24, 2021)

## II. THE MEDICAL RECORD DEMONSTRATES THAT C.'S RESIDENTIAL TREATMENT WAS MEDICALLY NECESSARY

Bruce presented his argument for the medical necessity of C.'s residential treatment in his Motion for Summary Judgment and incorporates those arguments in this memorandum. However, in Defendants' Motion for Summary Judgment, Aetna and the Plan argue that because multiple medical directors reached the same conclusion that they have met the burden of substantial evidence to support Aetna's decision to deny benefits.[16] But the consistency of the denial does not support Aetna's claims in light of how the record contradicts the reviewers' assertions.

A common problem with the denial letters is that they contain conclusory allegations from remote reviewers describing symptoms C. did not have while ignoring the many conditions and behaviors from which C. did suffer.[17] For appropriate context it is important to compare the conditions that supported the original coverage of benefits.

Aetna acknowledges that it approved coverage when C.'s behavior and treatment included the following:

- C. exhibited both verbal and physical aggression when he did not get his way. He had a low frustration tolerance, was reactive, and easily triggered.[18]

- ICH's treatment plan for C. included, among other things, mood stabilization, medication management, increasing healthy coping skills, decreasing unhealthy

---

[16] Rec. 24
[17] Rec. 428-433, 4045-4050
[18] Rec.  1677-82

coping skills, improving family dynamic, identifying internal emotional

dynamics, family therapy, and group therapy.[19]

- C. purposely tripped a peer who was riding rollerblades.  He also argued with

  peers and adults, and needed physical intervention.[20]

- C. struggled with accepting adult control, but some days seems to be lessening.

  He struggled to trust staff, pushed limits with some staff, and tried to pass of

  rudeness as being funny. C. pushed limits, believed he is always right and was

  defiant. C. showed some compliance, but struggled to stay on task. It was noted

  that C. was making some improvement, accepting some adult feedback, and could

  be compliant at times.[21]

When C. displayed these behaviors, Aetna approved benefits.[22] Aetna cannot reasonably

explain why it denied benefits when C. continued to show these behaviors throughout his time in

treatment.  In each of their appeals the family provided medical records that highlighted C.'s

treatment and experience at ICH. Below is a summary of the selected records contained in each

appeal letter that documented the behaviors C. continued to show.

**Level One Appeal Summary**

In his first level appeal,[23] Plaintiff referenced 104 separate assessments, shift notes,

session reports, etc., from C.'s medical records at ICH. Because there are so many references it is

---

[19] Rec. 30
[20] Rec. 1693-97
[21] ECF Doc. 24, p. 10, ¶23
[22] ECF Doc. 24, p. 9-10 at ¶¶ 15-24
[23] Rec. 476-671, 736-758, 1204-1221, 1294-1721

impractical to cite all of them in this brief. However, during that 6-month period between June 13, 2018 to December 17, 2018, Plaintiff identified at least:

- 53 instances of non-compliance
- 63 instances of arguing
- 52 instances of disruption
- 31 instances of instigation
- 29 instances of pestering/teasing
- 32 instances of agitation
- 46 instances of inappropriate language/gestures
- 12 instances of physical violence
- 19 instances of avoidance
- 31 instances of non-physical aggression
- 17 instances of sexualized behavior
- 30 instances of tantrums
- 23 instances of lying
- 4 instances of "odd behavior"
- 24 instances of manipulation
- 5 instances of disheveled appearance
- 1 instance of suicidal ideation
- 1 instance of property destruction[24]

---

[24] Rec. 12002-12237

This is a relatively small sample of the entire medical record, but it is clear that C.'s inappropriate behavior was consistent throughout the time and treatment at issue for the first level appeal.

**Second Level Appeal**

In their second level appeal[25] the M. family referenced 44 separate assessments, shift notes, session reports, etc., from C.'s medical records at ICH. Because there are so many references it is impractical to cite all of them here. However, during that 4-month period between December 23, 2018 and April 23, 2019 there were at least:

- 27 instances of non-compliance

- 14 instances of arguing

- 11 instances of non-physical aggression

- 9 instances of physical violence

- 4 instances of inappropriate language/gestures

- 9 instances of instigation

- 3 instances of pestering/teasing

- 1 instance of lying

- 5 instances of sexualized behavior

- 1 instance of avoidance[26]

Again, this is a relatively small sample of the entire medical record contained in the appeal, but it is clear that C.'s inappropriate behavior was consistent throughout the relevant time period.

---

[25] Rec. 439-476, 1962-2030, 4001-4043,
[26] Rec.12284-12322 (This part of the record appears in reverse chronological order)

**External Review Organization appeal**

As C. remained in treatment, Bruce updated the medical records as part of the external review up until the time of C.'s discharge. For the relevant period of time, Bruce referenced 57 separate assessments, shift notes, session reports, etc., from C.'s medical records at ICH.[27] The records account for the period of time between May 1, 2019, and August 25, 2019. During that 4-month period there were:

- 21 instances of non-compliance

- 31 instances of arguing

- 11 instances of avoidance

- 3 instances of disheveled appearance

- 10 instances of pestering/teasing

- 3 instances of sexualized behavior

- 16 instances of agitation

- 12 instances of disruption

- 5 instances of manipulation

- 8 instances of inappropriate language/gestures

- 9 instances of instigation

- 1 instance of "odd behavior"

- 3 instances of non-physical aggression

- 6 instances of withdrawal or lethargy

- 5 instances of tantrums

---

[27] Rec. 5930-6121

- 4 instances of lying

- 1 instance of physical violence

This sample of the medical record that Bruce provided to Aetna illustrates that C.'s inappropriate behavior continued throughout the time he was in treatment. This does not mean that C. never behaved well. Bruce acknowledges that there were ups and downs. But there is nothing in Aetna's denial letter or its internal logs that refutes the facts and recommendations of C.'s treatment providers. In particular, ICH's January 3, 2019, letter that "[C] made some progress during our time working together, but his behaviors continue to escalate when emotionally dysregulated. He continues to put himself in situations where either he and/or other's safety was in danger."[28] Dr. Hash and Ms. Van Dyke added that while C. had made progress with his mood he still had little to no ability to redirect his impulses.[29]

Aetna asserts that "C.[] experienced no suicidal ideation, homicidal ideation, or history of suicidal or homicidal thoughts."[30] That argument ignores that a recommendation for residential treatment does not require those elements under most of the dimensions of the LOCAT.[31] Aetna's statement that C. did not exhibit symptoms of cruelty to animals was also wrong and inconsistent with the medical record.[32] These errors underscore Aetna's misunderstanding of the record and its application to C.'s request for coverage. When Aetna's reviewer, Dr. Schneider decided to deny coverage; he only stated one of the possible elements of the LOCAT and his

---

[28] Rec. 2001
[29] *Id.*
[30] ECF Doc. 24, p. 24
[31] Rec. 11603-11618
[32] ECF Doc. 24, p. 24, See Rec. 486, 630, 841, 939

conclusion was inconsistent with the medical record.[33] Another reviewer's explanation that

because C. was "doing better" that he no longer required residential treatment is not supported by

the LOCAT.[34] Indeed, under the LOCAT, "progress must be evident."[35] These same arguments

appeared in the following reviews and denials.[36]

What the medical record shows is that C. continued to satisfy the Plan's definition of

medical necessity as well as the terms of the LOCAT. The prelitigation record also confirms that

if Aetna had consistently interpreted the LOCAT as it did when it approved benefits it would

have continued to approve benefits because C. continued to pose the same risks. What isn't

supported is Aetna's claim that C. could have been "safely and effectively [ ] treated with

intensive outpatient therapy."[37] In reaching this conclusion Aetna failed to account for the safety

that ICH provided that would have been absent had C. been treated at a lower level of care.

In *Wiwel v. IBM Medical and Dental Benefit Plans for Regular Full-Time and Part-Time
Employees*,[38] the court concluded the insurer's denial of benefits was erroneous under an abuse

of discretion standard because the reviewers failed to evaluate whether improvements in the

patient's symptoms would continue if she was removed from residential treatment.[39] The court in

*Wiwel* called the influence that the facility has on the improvement in behavior a "confounding

variable" that the insurer's reviewers failed to take into account when they denied claims.[40] Just

---

[33] ECF Doc. 24, p. 25
[34] ECF Doc. No. 24, p. 26
[35] Rec. 11608
[36] ECF Doc. 24, pp.28- 29
[37] ECF Doc. 24, p. 27
[38] 2018 U.S. Dist. LEXIS 28381, 2018 WL 526988 (E.D.N.C. Jan. 18, 2018)
[39] *Id*. at *4-5
[40] *Id.*

as in *Wiwel,* Aetna's denial letters shed no light on how it concluded that "in the absence of [ICH]'s care, [C.]'s behavior would have remained stable after [July 12, 2018.][41]

Another court in this district found under similar circumstances that the failure to account for the effect of the residential treatment center made the opinions of the reviewers less reliable and reversed a decision to deny benefits.[42] In *Charles W.* the court also found that when a patient continued to present with the same concerning behaviors before the denial date and afterward that the decision to deny benefits was based on an arbitrary date.[43] The *Charles W.* court noted that the child had both good days and bad days but that the problematic behaviors continued after the insured denied benefits and were "essentially identical."[44] The court found "the most logical explanation for [the insurer's] decision is simple impatience."[45] Because the insurer's denial was unjustified the court reversed the decision to deny benefits.

Using either the preponderance of the evidence or an abuse of discretion standard of review, Bruce has met his burden of proving that C.'s residential treatment was a covered benefit for which Aetna should have paid. Bruce asks that this Court reverse Aetna's decision.

### III. BECAUSE AETNA FAILED TO FOLLOW THE LOCAT GUIDELINES, ITS DECISION TO DENY BENEFITS WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

As part of Aetna's claim that its decision to deny benefits was supported by substantial evidence Aetna alleges that it followed the LOCAT.[46] However, Aetna deviated from the terms

---

[41] *Id.*
[42] *Charles W. v. Regence BlueCross BlueShield of Or.*, No. 2:17-cv-00824-TC, 2019 U.S. Dist. LEXIS 167184, (D. Utah Sep. 27, 2019)
[43] *Id.* at *21-26
[44] *Id.* at *30.
[45] *Id.* at *31
[46] ECF Doc. 24, pp. 6-7

of the LOCAT in multiple ways. For example, Aetna replaced the sound clinical judgment of

C.'s treating providers with its own. Moreover, Aetna failed to authorize the highest level of care

as recommended by the LOCAT dimensions. These deviations undermine the reliability of the

decision to deny benefits and call for a reversal of that decision.

### A. AETNA Deviated from the Terms of the LOCAT When It Ignored the Good Clinical Judgment of C.'s Treating Providers

The LOCAT begins with an introduction paragraph that provides basic principles that

should guide reviewers as they evaluate claims for benefits.[47] These principles reflect the

importance of reliance on good clinical judgment and deference to the terms of plan documents

over the terms of the LOCAT alone.

> LOCAT is not a replacement for good clinical judgment, which should be
> exercised both in connection with applying the LOCAT guidelines as described
> below and more broadly in assessing the medical necessity of particular levels of
> treatment in light of the specific condition for which the member is seeking
> treatment. Moreover, the benefits available to a covered person are based solely
> on the terms of the person's plan of benefits which governs all coverage
> decisions.

This case calls into question whether Aetna followed the directions that come from the very

guidelines that it claimed to use in guiding whether a claim should be denied.

Plaintiff previously discussed the role of the treating physician in his Motion for

Summary Judgment.[48] As part of that discussion Bruce acknowledged that while there is no rule

that demands a reviewer or a court give automatic deference to a treating provider, the

recommendation of treating providers cannot be ignored.[49]

---

[47] Rec. 11603
[48] ECF 25, pp. 35-37
[49] *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003); ECF Doc. 25, p. 36

The Northern District of Illinois addressed this specific issue in another residential treatment case, *Dominic W. v. Northern Trust Co. Employee Welfare Benefit Plan*.[50] In that case the court faulted a health insurer for, among other things, ignoring the recommendations and prescriptions of mental health care from the patient's treatment physicians.[51] As in *Dominic W.,* the Defendants abused their discretion because they discounted the "near-unanimous opinions" of C.'s treating clinicians without any meaningful explanation.[52]

*Dominic W.* is not alone in criticizing ERISA plans which fail to give adequate weight to the treatment physicians' recommendations when evaluating the medical necessity or impact of mental health disorders. The cases addressing the issue are numerous and persuasive.[53]

That is not only a policy recognized by the judiciary but the declaration that the "LOCAT is not a replacement for good clinical judgment"[54] means that if Aetna was going to deviate from the judgment of the treating professionals Aetna needed to explain the reason for that deviation. In addition, the deviation from good clinical judgment needs to occur in the context of the "specific condition for which the member is seeking treatment."[55]

---

[50] 392 F.Supp.3d 907 (N.D. Ill. 2019)
[51] 392 F.Supp.3d at 917-919
[52] 392 F.Supp.3d at 919
[53] *Okuno v. Reliance Standard Life Ins. Co*., 836 F.3d 600, 610 (6th Cir. 2016) ("[F]ile reviews are questionable" as a basis for evaluating the severity of a mental illness); *Javery v. Lucent Technologies, Inc. LTD Plan*, 741 F.3d 686, 702 (6th Cir. 2014) (same); *Smith v. Bayer Corp. LTD Plan*, 257 Fed Appx. 495, 505-509 (6th Cir. 2008) (courts discount "for obvious reasons" the opinions of medical file reviewers who have not seen the patient); *Sheehan v. Metropolitan Life Ins. Co*., 368 F.Supp.2d 228, 254-255 (S.D.N.Y. 2005) ("courts routinely discount or entirely disregard the opinions of psychiatrists who had not examined the individual in question at all or for only a limited time"); *Westphal v. Eastman Kodak Co*., 2006 U.S. Dist. LEXIS 41494, *12-17 (W.D.N.Y. 2006) ("the opportunity to interview and interact with a psychiatric patient is crucial to the diagnosis" of a mental health disorder)
[54] Rec. 11603
[55] Rec. 11603

The recommendations from C.'s treating professionals was uniform and consistent with his long history of behavioral struggles. In particular, C.'s treating professionals made their recommendations based upon C.'s actual response to treatment in lower levels of care or in hospital interventions of short duration. Dr. Terry Young provided a brief synopsis of C.'s history as part of his psychological evaluation that Bruce submitted to Aetna as part of his Level One Member Appeal.[56] A review of Dr. Young's evaluation confirms that he knew C. and his circumstances based on personal experience, observation, and testing. After providing impressions regarding C. "disruptive mood dysregulation disorder" from a "longstanding inability to self-regulate emotions" Dr. Young provided treatment recommendations.

Dr. Young's recommendations included a two step treatment plan. The first plan was to have C. participate in a program that integrated consistency for C. while he was at home and at school. But Dr. Young also proposed a Plan B. Dr. Young recognized that because C. displayed "increasing frequency and intensity of the behavioral-emotional outbursts, efforts should be directed toward identifying a residential program providing psychological and behavioral supports, and incorporating academics into the treatment program."[57] Dr. Young also explained that "it would be unlikely a short stay would be sufficient to alter the behavioral and emotional patterns established - especially in light of the recent inpatient hospitalizations which have not offered much beyond marginal and temporary gains.[58]

In response to these clinical recommendations, Aetna provides no explanation as to why it deviated from the judgment of C.'s treating providers. Aetna's initial denial letter states that

---

[56] Rec. 1211
[57] Rec. 1218
[58] Rec. 1218

"the information received does not show that you are reacting too strongly to things and starting intense inappropriate arguments almost every day."[59] That denial was in a record that was dated July 13, 2018. The psychological evaluation was conducted in December of 2017. But even though there were clinical recommendations for long-term residential treatment, Aetna gives no indication that it considered the context of C.'s failed treatment history when it deviated from explicit, unambiguous treatment recommendations.

It is possible that Aetna did not have a copy of the evaluation at the time of the original denial letter because the prelitgation record shows that it was provided at the time of the first level appeal. But this also suggests that Aetna was willing to make a coverage decision without reliance on "good clinical judgment" and that it deviated from the very guidelines it claimed to employ. Either way, Aetna's failure undermines its claim that its decision to deny benefits was based on substantial evidence. This conclusion is reaffirmed because the denial letter for the Level One Appeal also omitted any reference to Dr. Young and his evaluation.[60]

To make matters worse for Aetna, Dr. Young provided an updated August 13, 2018, letter that indicated he would make available to Aetna all of the evaluations he had conducted leading up to his recommendation for residential treatment. Dr. Young also specifically opined: "I consider this to have been a medically necessary treatment course."[61] Again, there is no response from Aetna nor any discussion as to why it deviated from his clinical judgment. The logical conclusion is that Aetna replaced "good clinical judgment" with a perfunctory "check the

---

[59] Rec. 39
[60] Rec. 428-433.
[61] Rec. 2298

box" application of the LOCAT. Finally, there is no mention of Dr. Young's evaluation or letter in Aetna's denial letter for the Second Level Appeal.[62]

Dr. Young did not stand alone in prescribing residential treatment for C. Dr. Mark Batory, M.D., M.M. wrote a letter supporting ongoing treatment at the residential level of care.[63] Dr. Batory had been C.'s treating provider since May 5, 2015. Dr. Batory's letter makes clear that he knew and understood C.'s specific conditions that needed treatment.[64] Dr. Batory documented his treatment interventions, the types of care that C. had received, and the consequences of that treatment. Dr. Batory acknowledged that through many medication changes, C. suffered the side effects of "weight gain, sedation/drowsiness, suicidality, and metabolic derangement."[65] He characterized C. treatment history in this way: "Collectively, [C.'s] family and the community of mental health providers in the Milwaukee area have thrown everything but the kitchen sink at him."[66] And even though Dr. Batory found C. to be "the most challenging and heart-breaking patient I have ever treated," he urged that Aetna not give up on treatment and concluded that [f]urther residential treatment is warranted and I strongly recommend authorizing it."[67]

Bruce also provided Aetna with a letter from Dr. Michael S. Connolly who provided additional clinical judgment regarding the scope of residential treatment.[68] Dr. Connolly confirmed that the average length of time for residential treatment of adolescents is between

---

[62] Rec. 4045-4050
[63] Rec. 2300
[64] *Id.*
[65] *Id.*
[66] *Id.*
[67] *Id.*
[68] Rec. 566

seven and ten months.[69] Dr. Connolly also disabused Aetna of the error in looking at residential treatment as a short-term solution for many patients. Given that Aetna only provided coverage for one month of what resulted in a 14-month treatment stay, Aetna's violation of clinical judgment certainly deviated from the "good clinical judgment" that it had before it.

As a final added measure, Bruce provided Aetna with a letter of medical necessity from C.'s then current treatment providers at ICH.[70] The letter was authored by ICH's Medical Director, Phillip A.K. Hash, D.O., P.hD and Ashley Van Dyke, MSW, C.'s therapist.[71] That letter documented that C. had continued need for residential treatment. C.'s emotional reactivity negatively affected his relationship with peers. And while C. had made some progress, his behavior escalated and C. "continues to put himself in situations where either he and/or other's safety was in danger."[72] Dr. Hash and Ms. Van Dyke presented Aenta with unrefuted evidence that C. did not have the ability to redirect his impulses and that he required 24/7 supervision in a residential treatment setting.[73] Dr. Hash and Ms. Van Dyke also opined "[C.] has not demonstrated this insight or the coping skills to be successful at home." [74] As a consequence, ICH recommended continued residential treatment.

In the face of these facts, Aetna offered conclusory denials that disregarded the actual facts. Aetna alleges that it "cited substantial evidence that the continued inpatient treatment was not medically necessary."[75] What Aetna actually did was repeatedly deny benefits without regard

[69] Rec. 566
[70] Rec. 2001-2002
[71] Rec. 2001-2002
[72] Rec. 2001
[73] *Id.*
[74] Rec. 2002
[75] ECF Doc. 24, p. 23

to the facts in the record about C's treatment and progress. Aetna's reliance on the quantity of reviewers who reached the same conclusion does not detract from the fact that it reached its conclusions without regard to the recommendations of the treating providers and in essence replacing "good clinical judgment" for its own.[76]

Again, the record shows that Aetna deviated from the LOCAT because it did not properly include the components that should go into a coverage decision. The LOCAT provides that Aetna was to consider at least all of the following:

- Data from the comprehensive clinical interview

- Past clinical history

- Assessment of the current support system

- Current medical status

- Comprehensive risk assessment.

Aetna cannot demonstrate that it relied on a comprehensive clinical interview because it doesn't mention it.

Aetna also cannot say that it evaluated C.'s family history and the ability of his current support system to meet his needs. The record shows that as late as January 3, 2019 C. had not demonstrated the skills to be successful at home. In the face of that evidence Aetna wrote in its denial letters "He was compliant with medications. His parents were involved and engaged in treatment."[77] All of C.'s treatment providers provided facts that indicated that C. was not ready to go home. Rather than address those facts, Aetna replaced "good clinical judgment" with its

---

[76] ECF Doc. 24., p. 24-31
[77] Rec. 429, 4046

own facts to support its decision.[78] And although the denial letters were signed by two different reviewers, the denial rationale is almost the same.[79] Because Aetna replaced the good clinical judgment of C.'s treating providers it failed to follow the LOCAT and its decision was not based on substantial evidence.

**B.    Because Aetna Failed to Recommend the Highest Level of Care as Directed by the LOCAT, its Decision to Deny Benefits was Not Supported by Substantial Evidence.**

The LOCAT has defined five dimensions to evaluate a member's conditions and symptoms for coverage at the proper level of care. Under each dimension, the LOCAT describes symptoms that would justify care at the different levels of care. The LOCAT provides that the "covered level of care at the time of the assessment is the highest level of care recommended in any of the dimensions."[80] As discussed above, Aetna's decision to deny benefits was predicated on an unsupported claim that C. could be treated at a lower level of care. Because the evidence shows that C.'s symptoms justified a higher level of care, Aetna's decision to deny benefits was not based on substantial evidence because it violated the terms of the LOCAT that it was using to evaluate C.'s claims.

In its first denial letter Aetna did not indicate what the lower level of care should be,[81] but in its letters responding to Bruce's appeals, Aetna concluded that C. could be treated at an intensive outpatient level of care.[82] As already discussed, C.'s treating providers refuted that

---

[78] Rec. 1211-1218, 1998-2002, 2296-2300
[79] Rec. 429, 4046
[80] Rec. 11607
[81] Rec. 39-43
[82] Rec. 428-433, 4045-4050

claim and documented that when C. participated in intensive outpatient treatment it resulted in temporary benefits for C.[83]

Because Bruce has argued that C. met the requirements for residential treatment under the Acute Dangerous Dimension of "[i]rritability/aggression/mania," he will compare the same dimension criteria for intensive outpatient treatment and residential treatment.[84] Intensive Outpatient Treatment is recommend if there is "[d]aily or frequent inappropriate arguments with other people without physical violence."[85] This assessment of C.'s behavior is correct but incomplete. Bruce does not dispute that there are times when C. engaged in inappropriate arguments that did not include physical violence. The problem for Aetna is the record reflected a physical component to C.'s emotional dysregulation.

Under the same dimension, residential treatment is recommended where there are almost daily arguments that include physical confrontation or violence but without the use of a weapon. As a comparison, if C. were using weapons, the LOCAT would suggest inpatient hospitalization.[86] But to deny the coverage for residential treatment center care, Aetna had to ignore the medical record that was provided. Bruce provided a summary of the number of problematic behaviors that C. showed on a near daily basis throughout his treatment in each of his appeal letters. He highlighted the more critical elements and this brief provided a brief calculation of the frequency of various problematic behaviors.

//

_____

[83] Rec. 2296, 2300
[84] Rec. 11611
[85] Rec. 11611
[86] Rec. 11611

But in January 3, 2019, C.'s providers wrote that C. exhibited all of the following:

- both verbal and physical aggression when not getting his way.

- He has low frustration tolerance.

- Emotionally reactive

- Continues to put himself in situations where either he and/or other's safety is in danger

- C. struggles with trust of caregivers and incredibly low self-worth

As a result of these symptoms and circumstances, Dr. Hash and Ms. Van Dyke opined that the combination of factors "poses a danger to his ability to live in a less restrictive environment." So while C. certainly satisfied the intensive outpatient requirement, he also satisfied the residential treatment center requirements. According to the LOCAT, the reviewers should have approved the higher level of care.

But Bruce also argued that C. satisfied the Functional Impairment dimension for residential treatment center level of care. According to that dimension to qualify for intensive outpatient treatment the member must display social withdrawal from some situations but not from school. This factor also looks at issues of appetite, weight gain, and sleep disturbances. While C. did experience weight issues as part of the side effects of medication his treatment was never focused on an eating disorder or weight control. Nevertheless, Aetna included the absence of sleep and appetite factors in its denial letters.[87] Aetna also relied on the lack of immediate

---

[87] Rec. 4047, 429

suicidality or homicidality and danger to self or others.[88] But these are only factors for inpatient treatment under the acute dangerous dimension and not applicable to C.'s care.

As a comparison, to qualify for residential treatment under the functional assessment dimension the member must show a withdrawal from almost all situations, including educational settings; a complete disruption of relationships, and being expelled from school due to mental status. The stated reason for C.'s admission was that he "presented unsafe behaviors in the home and school setting that posed a risk to himself or others."[89] Aetna acknowledges in its own briefing that "At the time of admission C.M. had just been expelled from school for kicking a teacher, throwing things, and showing a lot of physical aggression towards others, and his symptoms were reportedly escalating."[90] In their Level One Appeal letter, Bruce and Annie (C.'s mother) described that at school C. was kept away from other kids, not participating in recess or lunch in order to avoid violence.[91] They also described that at home the relationship had been so disrupted that it was like walking on eggshells.[92] Finally, they confirmed that C. was breaking things around that house and they even needed to call law enforcement because C. "was trying to go after Annie" and "Bruce had to hold him down."[93]

The combination of all of these factors showed that C. satisfied the conditions of the higher residential treatment center level of care. Had Aetna followed the directions of the LOCAT it would have approved the higher level of care as instructed. Because Aetna deviated

---

[88] Rec. 429, 4046
[89] 3176
[90] ECF Doc. 24, p. 9 at no. 15
[91] Rec. 488
[92] *Id.*
[93] Rec. 488

from the requirements of the LOCAT its decision to deny benefits was not based on substantial evidence. For all of these reasons Aetna's decision to deny benefits should be reversed.

    **C.**    **Aetna's Reliance on the External Review is Misplaced Because that Reviewer Failed to Explain how C.'s continued Behaviors Did Not Justify Continued Care.**

At the end of its Motion for Summary Judgment Aetna claims that its decision to deny benefits was supported by an external review.[94] Bruce does not dispute that the external reviewer upheld the decision to deny benefits, but this reviewer also misapplied the LOCAT.

First, as a basis to uphold the denial the reviewer relied on the fact that C. was not "actively suicidal, homicidal, or psychotic."[95] This basis is problematic because according to the LOCAT those circumstance would suggest inpatient treatment, not a reason to deny residential treatment care.[96] The external reviewer also misrepresented the medical record when it stated that C. was not sexually inappropriate.[97] This error in fact was confirmed in the family appeal letters as well as the medical record that describe instances of yelling titties and boobies, thrusting, and stimulating himself publicly under his clothes.[98] Because the record is voluminous it is impractical to list each of the instances but even one incident would disprove the reviewer's claim.

In upholding the denial, the reviewer stated "[C.] was able to work on some coping skills, but the patient's defiance and oppositional behavior was ongoing throughout. This appears to be

---

[94] ECF Doc. 24, p. 30
[95] Rec. 5091, See also ECF Doc. 24, p. 30
[96] Rec. 11609
[97] Rec. 5091
[98] Rec. 460, 461, 498, 499, 502, 517, 521-523, 527-528, 4011, 5456, 5476, 5540, 5559, 3, 5564-5566, 5587-5589

more of a chronic behavior. Treatment could have been addressed at a lower level of care."[99] The reviewer's non sequitur fails to support the decision to deny benefits. The external reviewer's combined errors in the record and faulty judgment make their conclusion unreliable. In its totality the external review does not provide substantial evidence that Aetna was right. When read in full, the external review provides the factual basis that supports an award of coverage for C.'s residential treatment.

## **CONCLUSION**

The prelitigation record conclusively establishes that in spite of tremendous efforts and multiple interventions C. presented as a very sick child as a result of numerous mental health diagnoses. C.'s mental health problems disrupted his home, school, and social lives. C.'s treatment history reflects interventions from multiple providers at various levels of care. The Parties may argue over the proper standard of review but the record compels a decision that C. required ongoing residential treatment if he was going to get better. Aetna ignored the impotence of lesser level of care in helping C. to correct his problematic behaviors.

DATED this 10th day of August, 2021.

By      s/ Brian S. King
             Brian S. King
             Attorney for Plaintiffs

---

[99] Rec. 5091

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing PLAINTIFF'S

OPPOSITION MEMORANDUM TO DEFENDANTS' MOTION FOR SUMMARY

JUDGMENT has been served to all parties registered to receive Court notices for the above

captioned case through the Court's CM/ECF System.

DATED this 10th day of August, 2021.


/s/ Brian S. King