THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| BRUCE M., individually and on behalf of C.M. a minor,<br><br>Plaintiffs,<br><br>v.<br><br>AETNA LIFE INSURANCE COMPANY, and the MARSH & MCLENNAN COMPANIES HEALTH & WELFARE BENEFITS PROGRAM,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER DENYING [24] DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART [25] PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:20-cv-00346-DBB<br><br>District Judge David Barlow |

Defendant Aetna Life Insurance Company (Aetna) denied Plaintiffs' claims for C.M.'s continued treatment at a residential treatment center under an employee welfare benefits plan. Plaintiffs contend their claims were wrongly denied under the Employee Retirement Income Security Act of 1974 (ERISA).[1] Before the court are the parties' cross-motions for summary judgment.[2] Having considered the briefing and the relevant law, the court concludes the motions may be resolved without oral argument.[3] For the reasons discussed below, the court denies Defendants' Motion for Summary Judgment and grants in part and denies in part Plaintiffs' Motion for Summary Judgment.

---

[1] *See generally* 29 U.S.C. § 1001, *et seq.*

[2] Plaintiffs' Motion for Summary Judgment (Plaintiffs' Motion), ECF No. 25, filed July 13, 2021; Defendants' Motion for Summary Judgment (Defendants' Motion), ECF No. 24, filed July 13, 2021.

[3] *See* DUCivR 7-1(f).

## BACKGROUND

C.M. was covered under a self-insured employee welfare benefits plan (the Plan) through Bruce M.'s employment.[4] The Plan sponsor is Marsh & McLennan Companies, Inc., and claims for certain benefits are administered by Aetna.[5] The parties agree that the Plan confers on Aetna the discretionary authority to construe and interpret the Plan.[6] Under the Plan, benefits "are only paid for medically necessary charges or for specified wellness care expenses."[7] "Medically Necessary" is defined in detail in the Plan.[8]

Aetna uses a Level of Care Assessment Tool (LOCAT) as "guidelines for evaluating the medical necessity of care for mental health disorders.[9] LOCAT provides that "assessment by Aetna clinicians is limited to the specific issue of whether the treatment is covered under the terms of a member's health plan."[10] LOCAT provides certain admission and continued stay criteria.[11] Admission criteria relies on five "dimensions" including:

1. **Acute dangerousness:** Member presents with a level of risk related to harm toward themselves through suicide, self-injury, irritability or mania; or to others through aggression, assaultive or homicidal behavior.
2. **Functional impairment:** Member presents a temporary and reversible reduction in ability to function such as performing personal hygiene and bodily care activities, obtaining adequate nutrition, sleep, functioning in the work place or at school, or becoming socially isolated.

---

[4] Amended Complaint at ¶¶ 1–3, ECF No. 6, filed August 17, 2020.

[5] *See e.g.*, Benefits Handbook and Administrative Information, PLAN001–184.

[6] Defendants' Motion at 22; *See* Plaintiffs' Motion at 26; Plaintiffs' Opposition Memorandum at 16, ECF No. 29, filed August 10, 2021; PLAN084.

[7] PLAN013.

[8] PLAN076.

[9] AR11603. For ease of identification, the court refers to the Bates-numbered administrative record of Aetna's benefits decision as "AR" followed by the number.

[10] AR11606.

[11] AR11607–08

3. **Mental status changes or co-occurring conditions:** Member presents with disrupted mood, disordered thinking, disorientation or other mental status changes that need care at the level requested; or there are medical or substance related issues that require care at the level requested.

4. **Psychosocial factors:** The member's challenges related to stress from family members, friends, coworkers or others, housing, and work or school that have an impact.

5. **Additional modifiers:** The member's history of response to prior treatment, their personal resources such as intellect, characterological issues, and past history of violence or self-harm.[12]

The "Acute Dangerousness" dimension has four "sub-dimensions" that are used to "provide a more complete picture of a member's mental health."[13] These sub-dimensions are suicidal intent, self-injuriousness, homicidal intent, and irritability/aggression/mania.[14]

Continued stay criteria requires that

the member must continue to require the level of care provided by that facility (that is, treatment at a lower, less restrictive level of care is not medically appropriate). In assessing whether continued care at the current level of care is covered, an Aetna clinician must evaluate the same factors as considered at admission….[15]

Each dimension under LOCAT provides for circumstances justifying the following treatment level: (1) inpatient (IP); (2) residential treatment center (RTC); (3) partial hospitalization (PHP); (4) intensive outpatient (IOP); and (5) outpatient (OP).[16]

Requirements for RTC level-of-care for Dimension 1: Acute Dangerousness are:

A. Suicidal Intent: "Suicidal plan and intent, but without organized means to execute the plan. The member is able to develop a plan for safety with some reservations or conditions (only in a facility, etc.), or the member is not able to develop a plan for safety but is well known to the practitioner/evaluator and is not believed to be at serious risk. Or, an attempt has been made, and there was

---

[12] AR11607.

[13] AR11608.

[14] AR11608–11.

[15] AR11607–08.

[16] *See* AR11608–18.

a plan with intent but the patient exhibits some remorse. The member is now able to develop a plan for safety with some reservations or conditions (only in a facility, for example), or the member is not able to contract for safety but is well known to the practitioner/evaluator and is not believed to be at serious risk."[17]

B.   Self-injuriousness: "Medical intervention is necessary. Self-inflicted wounds and or burns, overmedicating self or other self-harm; or there are unstable vital signs or metabolic abnormalities confirmed by laboratory values. Behavior that demonstrates impaired judgment to the extent that serious harm or death may result (for example, a member with an eating disorder with electrolyte abnormalities, cardiomyopathy, serious bradycardia [for example, a heart rate below 40 in an adult, a blood pressure below 90/60, or a temperature below 97]; or member needs direct supervision to comply with medication or meals)."[18]

C.   Homicidal intent: There is only OP/IOP, PHP, and IP level of care under this sub-dimension.[19]

D.   Irritability/aggression/mania: "Intense inappropriate arguments occur almost continuously; and/or arguments occur almost daily and involve periodic physical confrontation and/or violence but without the use of an implement or weapon; or grandiose or impaired judgment; or markedly increased activity level; or severe psychosis impairing functioning."[20]

C.M. was admitted to Intermountain Children's Home (ICH) on June 13, 2018.[21] ICH is accredited as a residential treatment center (RTC).[22] C.M. received residential mental health treatment at ICH until August 25, 2019.[23] Under the "reason member is seeking care," Aetna listed "aggressive behavior."[24] In noting the admission criteria, the Aetna reviewer noted that C.M.:

was recently expelled from school for kicking a teacher, throwing things. Pt. has lots of physical aggression toward others. Long hx of aggression, and behavioral

---

[17] AR11609.

[18] AR11610.

[19] AR11610–11.

[20] AR11611.

[21] AR30.

[22] AR30.

[23] AR5107; *see also* Plaintiffs' Motion at 33.

[24] AR30.

discontrol at home and [the] school. Long hx of INPT MH admits. Pt. sxs are escalating. No SI or HI, hx of SI thoughts no concurrent No HI thoughts, HX of hurting himself, scratching himself, pt. will act out physically and verbally then get depressed afterward. Hx of aggression toward peers, no fire setting, no cruelty to animals, no enuresis. Sometimes Episodes of screaming in his sleep. Intact family…Treatment plan: mood stabilization med management, increase healthy coping skills, decrease unhealthy coping skills, improve family dynamic, identify internal emotional dynamics, med management, family therapy, group therapy…LOCAT Pt. is at high risk for danger to others, aggression toward peers and teachers, recently kicked a teacher. Long hx of aggression and behavioral discontrol. If MNC is not met, score a full LOCAT/ASAM/TAC/LOCADTR and refer to MD.[25]

Aetna initially approved treatment from June 13 to June 20, 2018.[26] In its initial assessment, ICH noted that C.M. had a history of verbal and physical aggression with a low frustration tolerance.[27] The current risk factors listed were "intentional misbehavior, self-injury. He has exhibited [both] verbal and physical aggression when not getting his way. He expresses remorse and sadness after these episodes. He has a low frustration tolerance, is reactive and easily triggered."[28] There was no suicidal ideation.[29]

Aetna conducted a review on June 19, 2018 and authorized continued coverage through June 26, 2018.[30] Aetna conducted another review on June 26, 2018.[31] The reviewer noted that C.M. "presents with a lot of verbal aggression, noncompliance, interruptive, avoiding, low mood, sexualized behaviors, disruptive, pushes limit, blurts out and demands attention, needs

---

[25] AR30.

[26] AR30, 60.

[27] AR1677.

[28] AR1678.

[29] AR1678.

[30] AR29–30, 103–04.

[31] AR28.

redirection, some sleep disturbance.[32] The reviewer also noted that C.M. was "making some improvement, accepting some adult feedback, can be compliant at times, working on being respectful, doing better with structure."[33] Aetna authorized coverage for an additional nine days until July 5, 2018.[34]

In the subsequent review on July 6, 2018, the reviewer noted that C.M. "struggles with [ac]cepting adult control but some days seems to be less[e]ning."[35] The reviewer noted C.M. continued to struggle with pushing limits, trying to pass off rudeness as being funny, noncompliance, and summarized some of his experiences in therapy.[36] Aetna authorized coverage for another seven days until July 12, 2018.[37] After a review on July 12, 2018, Aetna referred the case to a medical director for further review.[38] On July 13, 2013, Dr. Alan Schneider conducted a review and denied continued coverage at the RTC level.[39] Dr. Schneider determined that, when applying LOCAT, C.M. did not meet the requested level of care because he did not have "a level of irritability that results in intense inappropriate arguments that occur almost continuously. Treatment could be provided at a less intensive level of care or in another setting."[40]

---

[32] AR28.

[33] AR28.

[34] AR28–29.

[35] AR25.

[36] AR25.

[37] AR25–26.

[38] AR21–24.

[39] AR21.

[40] AR21.

Aetna sent a letter to Plaintiffs on July 13, 2018, notifying them that it was denying coverage as of July 13, 2018.[41] The letter stated that Aetna had applied LOCAT guidelines for residential treatment, and the records did not "show that [C.M. was] reacting too strongly to things and starting intense inappropriate arguments almost every day. Treatment could be provided at a less intensive level of care or in another setting."[42]

On January 2, 2019, Plaintiffs submitted a Level One appeal of the denial.[43] As part of that letter, Plaintiffs detailed C.M.'s background and treatment history, summarized his treatment at ICH, submitted thousands of pages of medical, education, and police records, and provided three letters of "medical necessity."[44] These three letters were from Kim Nodolf, MA, LPC; Terry Young, PsyD, ABN; and Mark Batory, MD, MMM.[45] Each of these professionals had previously treated C.M. and concluded that residential treatment was medically necessary.[46]

On March 8, 2019, Aetna denied the Level One appeal.[47] The letter provided that it reviewed the written appeal request, claim history, authorized representative designation form, authorization for release of protected health information, medical records, and Plan summary.[48] Aetna explained that it was denying coverage at a residential treatment center:

> Based upon our review of the information provided we are denying coverage at a mental health (MH) residential care for dates of service July 13, 2018 to December 31, 2018. The patient is an 11 year-old male admitted to residential care on June

---

[41] AR39–40.

[42] AR39.

[43] AR478.

[44] *See* AR478 et seq.

[45] AR2296–2300.

[46] *Id.*

[47] AR428–33.

[48] AR428.

13, 2018, with dates of services through July 12, 2018, previously approved. Available records indicate that the patient entered treatment with symptoms and behaviors consistent with Conduct Disorder, Disruptive Mood Dysregulation disorder and attention deficit hyperactivity disorder (ADHD), combined type. He had prior treatment interventions including inpatient and residential stays. For the dates under consideration there is no reported dangerousness toward self, or others. He continued to present with irritability and verbal aggression, and occasional outbursts. There were no reported issues with sleep or appetite. Patient's social interactions were reported to fluctuate, though nothing is documented indicating significant issues, or extreme behaviors. He was compliant with medications. His parents were involved and engaged in treatment. Records provide no compelling indication for care in an inpatient setting during this time, or that care could not reasonably continue safely and effectively in an ambulatory setting. Level of Care Assessment Tool (LOCAT) criteria do not support residential but support Intensive Outpatient with family therapy as the medically necessary level of care. Denial is upheld.[49]

On April 30, 2019, Plaintiffs filed a Level Two appeal.[50] They provided updated summaries of C.M.'s treatment at ICH since December 23, 2018 and included two additional letters of medical necessity from Judith E. Bessette, EdD[51] and Ashely Van Dyke, MSW, and Phillip K. Hash, DO, PhD.[52] Dr. Bessette previously treated C.M. and recommended residential treatment.[53] Ms. Van Dyke and Dr. Hash were part of C.M.'s treatment team at ICH and opined that continued treatment at ICH was necessary.[54] Ms. Van Dyke and Dr. Hash wrote that C.M. "continues to put himself in situations where either he and/or other's safety was in danger."[55]

---

[49] AR429.

[50] AR439 et seq.

[51] AR1997–99

[52] AR2000–02.

[53] AR1998

[54] AR2001–02.

[55] AR2001.

On June 4, 2019, Aetna denied Plaintiffs' Level Two appeal, upholding the denial of

benefits as of July 13, 2018. [56] Aetna indicated that it reviewed the Level Two appeal request, the

Level One appeal determination, the original claim determination, the authorized representative

form, the protected health information authorization form, the progress notes, the patient care

notes, the diagnostic results, the consultation notes, the submitted medical notes, and the Plan

Summary.[57] Aetna concluded that:

> Per the information reviewed patient was an 11 year old male admitted to residential
> care on June 13, 2018 with dates of service through July 12, 2018 previously
> authorized. He entered treatment with symptoms and behaviors consistent with
> Conduct Disorder, Disruptive Mood Dysregulation disorder and ADHD, combined
> type. He had prior treatment interventions including inpatient and residential stays.
> For the dates under consideration there was no reported dangerousness toward self,
> or others, He continued to present with irritability and verbal aggression, and
> occasional outbursts. There were no reported issues with sleep, or appetite.
> Patient's social interactions were not thought to indicate 'significant issues' with
> others. He was compliant with medications. His parents were involved and engaged
> in treatment. As of the date denial [sic] according to the information available about
> the member's condition, he was medically and psychiatrically stable, he denied
> suicidal and homicidal ideation, he was evidence [sic] psychotic thought process,
> he was not exhibiting mania or incapacitating depression. Patient was attending
> adequately to his activities of daily living and he was attending scheduled treatment
> activities. He did not require special risk precautions for behavior.
>
> LOCAT did not support MH RTC level of care, did support MH Intensive
> Outpatient Program (MH IOP) level of care. Patient did not meet all of the
> following criteria: 1) there was an immediate threat of further deterioration in
> mental status and a danger to self/others if not in RTC level of care and 2) RTC
> 24x7 stay was required for active diagnostic evaluation and treatment of an
> intensity that could be provided appropriately only in an RTC setting. Denial RTC
> upheld and MH IOP is Alternative Level of Care (MH IOP).[58]

---

[56] AR4044–51.

[57] AR4045–46.

[58] AR4046.

Pursuant to the Plan, Plaintiffs then filed a request for external review.[59] They again summarized C.M.'s treatment at ICH since May 1, 2019.[60] Medical Review Institute of America (MRIoA) conducted the review and upheld the denial of benefits.[61] In a letter dated November 5, 2019, MRIoA listed that it reviewed many documents including both appeals, thousands of pages of treatment notes from ICH, previous treatment history and police reports Plaintiffs provided during the appeals.[62] Over two pages, MRIoA summarized C.M.'s treatment at ICH and history.[63] MRIoA concluded:

> From 07/13/18-12/31/18, the LOCAT criteria was not met for MH RTC level of care. The patient has some irritability and occasional verbal outbursts. The patient was not actively suicidal, homicidal or psychotic. The patient was not physically aggressive. The patient had adequate sleep and appetite. The patient was going to groups. The patient's family was involved. The patient was [sic] not attempted to elope. The patient was not acutely manic or sexually inappropriate. Through 12/31/18, the patient continued to have some verbal outburst, was disruptive in class and groups, acting inappropriately silly, manipulative and testing boundaries. He blamed others for his mistakes. He had some intermittent episode of threatening to kill staff when upset, but was able to calm and there is no indication of plan or intent. The patient was medication compliant. He was able to work on some coping skills, but the patient's defiance and oppositional behavior was ongoing throughout. This appears to be more of a chronic behavior. Treatment could have been addressed at a lower level of care.[64]

---

[59] AR5101–34.

[60] AR5113.

[61] AR5087–88.

[62] AR5088–89.

[63] AR5089–90.

[64] AR5091.

Aetna sent Plaintiffs a letter on November 5, 2019 indicating that MRIoA had upheld the denial, and this was the "final level of review under the health benefits plan."[65]

Plaintiffs sued Aetna to recover benefits under ERISA and for violation of the Mental Health Parity and Addiction Equality Act.[66] The court previously granted the parties' stipulated motion to dismiss the Plaintiffs' second cause of action.[67] The remaining issue before the court now is Plaintiffs' first cause of action to recover benefits under ERISA.

## LEGAL STANDARD

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[68] "When both parties move for summary judgment in an ERISA case, thereby stipulating that a trial is unnecessary, 'summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility of benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor.'"[69]

---

[65] AR5084.

[66] Amended Complaint at 1–19.

[67] Order Dismissing Plaintiffs' Second Cause of Action, ECF No. 22, filed July 12, 2021.

[68] Fed. R. Civ. P. 56(a).

[69] *Michael D. v. Anthem Health Plans of Ky., Inc.*, 369 F. Supp. 3d 1159, 1167 (D. Utah 2019) (quoting *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010)).

### B. Review of Benefits Decision under ERISA

The court must first determine the standard under which to review Aetna's decisions. The United States Supreme Court has observed that "the validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan at issue."[70] Applying the law of trusts, the Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[71] "[I]f the plan gives the administrator discretionary authority, '[courts] employ a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious.'"[72] Under this deferential standard of review, the court "determin[es] whether the interpretation of the plan was reasonable and made in good faith."[73]

Here, the parties do not dispute that the Plan confers discretionary authority on Aetna to interpret the Plan and make benefits decisions.[74] Plaintiffs challenge Aetna's decision denying payment of benefits based upon its interpretation of the Plan.[75] However, interpretation of the Plan is precisely within Aetna's conferred discretion.[76] The presumptive standard of review is the arbitrary and capricious standard.

---

[70] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

[71] *Id.*

[72] *Hodges v. Life Ins. Co. of N. Am.*, 920 F.3d 669, 675 (10th Cir. 2019) (quoting *LaAsmar*, 605 F.3d 789 at 796).

[73] *Id.*

[74] Defendants' Motion at 22; *See* Plaintiffs' Motion at 26; Plaintiffs' Opposition at 16; PLAN084.

[75] Plaintiffs' Motion at 26–27.

[76] PLAN084.

Plaintiffs argue that Aetna forfeited the more deferential standard of review through its procedural irregularities, failure to respond to their questions in the appeals, and not engaging with the information provided in the appeals.[77] Because of this, Plaintiffs seek de novo review. Defendants counter that Tenth Circuit precedent applies and calls for an arbitrary and capricious standard of review so long as the administrator substantially complied with ERISA's procedural requirements.[78]

Employee benefit plans must "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant."[79] These plans also must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."[80] To ensure this full and fair review process occurs, the Department of Labor has developed certain procedural requirements.[81] A plan's claim procedures must "contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where

---

[77] Plaintiffs' Motion at 26–27.

[78] Defendants' Motion at 21–23.

[79] 29 U.S.C. § 1133(1). This section is the codified Section 503 of ERISA. The relevant implementing regulations are codified at 29 C.F.R. § 2560.503-1.

[80] 29 U.S.C. § 1133(2).

[81] *See generally* 29 C.F.R. § 2560.503-1 (implementing ERISA Section 503); *see also id.* § 2590.715-2719(b) (implementing "[o]ther consumer protection provisions, including other protections provided by the Affordable Care Act and the Mental Health Parity and Addiction Equity Act" as stated in 29 C.F.R. § 2590.701-1(b)).

appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants."[82] Regulatory subsection 2560.503-1(*l*) provides,

> in the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of [ERISA] on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.[83]

This subsection says nothing about the applicable judicial standard of review. However, the Department of Labor has asserted that the deemed-exhausted provision in this subsection "clarif[ies] that the procedural minimums of the regulation are essential to procedural fairness and that a decision made in the absence of the mandated procedural protections *should not be entitled to any judicial deference*."[84]

In *Halo v. Yale Health Plan, Director of Benefits and Records Yale University*,[85] the Second Circuit found that "under certain circumstances, a plan administrator's failure to comply with the letter of the claims procedures outlined in ERISA requires courts to eschew the more deferential arbitrary and capricious review normally applied to an administrator's discretionary decisions in favor of a more searching de novo review."[86] Finding 29 C.F.R. § 2560.503-1(*l*) ambiguous with respect to the applicable judicial standard of review, the Second Circuit deferred

---

[82] 29 C.F.R. § 2560.503-1(b)(5).

[83] *Id.* § 2560.503-1(*l*). In a similar regulation under the Patient Protection and Affordable Care Act, the Department of Labor has more specifically stated that where a plan fails to provide required procedural protections, the participant's "claim or appeal is deemed denied on review without the exercise of discretion by an appropriate fiduciary." *Id.* § 2590.715-2719(b)(2)(ii)(F)(1).

[84] EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974; RULES AND REGULATIONS FOR ADMINISTRATION AND ENFORCEMENT; CLAIMS PROCEDURE, 65 FR 70246-01 at 70255 (emphasis added).

[85] 819 F.3d 42 (2d Cir. 2016).

[86] *Id.* at 47 (citation and internal quotation marks omitted).

to the Department of Labor's interpretation that the deemed-exhausted provision intended to eliminate deferential judicial review.[87] The Second Circuit held,

> when denying a claim for benefits, a plan's failure to comply with the Department of Labor's claims-procedure regulation, 29 C.F.R. § 2560.503–1, will result in that claim being reviewed de novo in federal court, unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent *and* harmless.[88]

Plaintiffs request that the court adopt the *Halo* approach. But 29 C.F.R. § 2560.503-1(*l*) is not ambiguous, and so the court cannot adopt the Second Circuit's analysis. "A regulation is ambiguous if it is reasonably susceptible to more than one interpretation or capable of being understood in two or more possible senses or ways."[89] The court begins by "examining the plain language of the text, giving each word its ordinary and customary meaning."[90] "If, after engaging in this textual analysis, the meaning of the regulations is clear, [the court's] analysis is at an end[.]"[91]

Subsection 2560.503-1(*l*)(1) permits a civil action when a plan fails to use a reasonable claims procedure, but it says nothing about the judicial standard of review for that subsequent proceeding.[92] This subsection only authorizes a "route to judicial review" that administrative exhaustion requirements would otherwise preclude.[93] Because it does not address the applicable

---

[87] *Id.* at 53 (quoting 65 Fed. Reg. 70246-01, 70,255).

[88] *Id.* at 60–61.

[89] *Jake's Fireworks Inc. v. Acosta*, 893 F.3d 1248, 1261 (10th Cir. 2018) (citation and internal quotation marks omitted).

[90] *Mitchell v. Comm'r*, 775 F.3d 1243, 1249 (10th Cir. 2015).

[91] *Id.*

[92] 29 C.F.R. § 2560.503-1(*l*)(1).

[93] *Joel S. v. Cigna*, 356 F. Supp. 3d 1305, 1312 (D. Utah 2018)*, appeal dismissed* (Mar. 28, 2019).

standard of review, its language cannot be susceptible to more than one interpretation on this point. Thus, the court declines to adopt the *Halo* approach.

However, under certain circumstances, the standard of review can be heightened to de novo despite a plan administrator's discretionary authority. This can occur if: the administrator fails to exercise discretion within the required timeframe or fails to apply its expertise to a particular decision;[94] the case involves "serious procedural irregularities"[95] or "procedural irregularities in the administrative review process";[96] or the plan members lack notice of the administrator's discretionary authority.[97] Nevertheless, "in the context of an ongoing, good faith exchange of information between the administrator and the claimant, inconsequential violations of the deadlines or other procedural irregularities would not entitle the claimant to de novo review."[98] Although the Tenth Circuit has questioned the continued viability of this exception in light of regulatory changes,[99] it remains precedent to not "apply 'a hair-trigger rule' requiring de novo review whenever the plan administrator, vested with discretion, failed *in any respect* to

---

[94] *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 631–32 (10th Cir. 2003).

[95] *Martinez v. Plumbers & Pipefitters Nat. Pension Plan*, 795 F.3d 1211, 1215 (10th Cir. 2015).

[96] *LaAsmar*, 605 F.3d at 797; *Mary D. v. Anthem Blue Cross Blue Shield*, 778 Fed. App'x 580, 588 (10th Cir. 2019) (unpublished).

[97] *Lyn M. v. Premera Blue Cross*, 966 F.3d 1061, 1065 (10th Cir. 2020).

[98] *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1317 (10th Cir. 2009) (citing *Gilbertson*, 328 F.3d at 634).

[99] *Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 828 (10th Cir. 2008) ("In January 2002, amendments to the regulations took effect that have called into question the continuing validity of the substantial compliance rule."); *see also Halo*, 819 F.3d at 56 ("Whatever the merits of applying the substantial compliance doctrine under the 1977 claims-procedure regulation, we conclude that the doctrine is flatly inconsistent with the 2000 regulation."). In its 2000 implementation, the Department of Labor explicitly rejected the suggestions that it implement a "standard of good faith compliance as the measure for requiring administrative exhaustion," and it rejected the suggestion that it "recognize the judicial doctrine under which exhaustion is required unless the administrative processes impose actual harm on the claimant." EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974; RULES AND REGULATIONS FOR ADMINISTRATION AND ENFORCEMENT; CLAIMS PROCEDURE, 65 FR 70246-01 at 70255–56.

comply with the procedures mandated by this regulation."[100] With this precedent, the court examines whether Aetna substantially complied with ERISA's procedural requirements.

Plaintiffs argue that Aetna failed to comply with ERISA's procedural requirements in four ways.[101] First, Plaintiffs argue that Aetna did not explain its basis for denying the claim.[102] Second, Plaintiffs argue that Aetna did not take into account the information submitted during the appeals.[103] Third, Plaintiffs contend that Aetna did not engage in a "meaningful dialogue" and offered conclusory denials without reference to C.M.'s medical records.[104] Finally, Plaintiffs argue that Aetna did not provide Plaintiffs with a description of any additional material or information that would be necessary to perfect their claim.[105]

The federal regulations require Aetna to provide Plaintiffs with:

(i) The specific reason or reasons for the adverse determination;

(ii) Reference to the specific plan provision on which the determination is based;

(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

. . .

(v)(B) If the adverse determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the

---

[100] *LaAsmar*, 605 F.3d at 799.

[101] Plaintiffs' Motion at 26–27.

[102] *Id.* at 26.

[103] *Id.* at 26–27.

[104] *Id.*

[105] *Id.*

claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request.[106]

Aetna substantially complied with ERISA's procedural requirements. The initial denial letter, the Level One denial letter, the Level Two denial letter, and the MRIoA letter all state the specific reason for the denial and refer to the plan provision on which the denial was based.[107] Specifically, that Aetna applied LOCAT and continued treatment at ICH was not medically necessary.[108] All the letters provided a basis for the denial, referenced the Plan provision, and an application of the terms of the Plan to C.M.'s condition.

Next, while there may be some uncertainty as to the level of engagement with the various documents, each of the denial letters seemingly indicate that they reviewed the documents provided by Plaintiffs.[109] The original denial letter on July 13, 2018 indicated that based on the "information received," C.M. did not meet the LOCAT criteria.[110] The Level One denial letter provides that the review included: the written appeal request, claim history, authorized representative designation form, authorization for release of protected health information, medical records, and the Plan summary.[111] The "written appeal request" included many exhibits, including three letters of medical necessity.[112] In the Level Two denial letter, the following documents were reviewed: the level two appeal request, the level one appeal determination, the

---

[106] 29 C.F.R. § 2560.503-1(g)(1).

[107] AR39–40, 429–30, 4046–47, 5088, 5091–92.

[108] *Id.*

[109] AR428, 4045–46, 5088–89.

[110] AR39.

[111] AR428.

[112] *See* AR478–491, 2295–2300.

original claim determination, the authorized representative form, the protected health information authorization form, the progress notes, the patient care notes, the diagnostic results, the consultation notes, the submitted medical notes, and the Plan Summary.[113] The additional two letters of medical necessity were included in the Level Two appeal, which Aetna indicates it reviewed.[114] Lastly, the external review letter details the thousands of pages it reviewed including the appeals, ICH treatment notes, previous medical records, police records, educational records, and a psychological evaluation.[115] Plaintiffs have provided no basis for their assertion that the provided records were not reviewed. The court notes that the first three of these letters could have presented more information detailing the records and other documents that were reviewed. But the court is satisfied on this record that Aetna engaged in a good faith review of the materials.

Third, without much explanation, Plaintiffs argue that because the letters contained "functionally identical and conclusory" statements, there was no meaningful dialogue.[116] Aetna engaged with the Plaintiffs' materials and responded identifying criteria it believed C.M. did not meet for continued treatment at ICH. As just noted, while some of the letters would have contained more information or analysis, the substance of the letters support that Aetna engaged in a meaningful dialogue with Plaintiffs.

Lastly, there was no additional information that was required to perfect the claim. The basis for denial was that C.M.'s treatment at ICH was not supported by LOCAT and therefore not

---

[113] AR4045–46.

[114] *See* AR439–50, 1997–2002.

[115] AR5088–89.

[116] Plaintiffs' Motion at 26.

medically necessary. Each of Aetna's letters provided that Plaintiffs could request access to any relevant information[117] and provided the next relevant steps for an appeal.[118] Plaintiffs followed the instructions provided by Aetna and mounted a vigorous appeal.

In sum, the Plan confers on Aetna the discretion to interpret the Plan and make benefits decisions in accordance with the Plan. Thus, the court presumptively applies the arbitrary and capricious standard of review. The plain language of ERISA's implementing regulations does not require the court to engage in a de novo review. Plaintiffs have not shown serious procedural irregularities or other deficiencies that would require a less deferential standard. Accordingly, the court reviews the benefits determination under the arbitrary and capricious standard of review and "is limited to determining whether the interpretation of the plan was reasonable and made in good faith."[119]

## DISCUSSION

"Under arbitrary and capricious review, this court upholds [the administrator's] determination so long as it was made on a reasoned basis and supported by substantial evidence."[120] The Tenth Circuit defines substantial evidence as "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision-maker. Substantial evidence requires more than a scintilla but less than a preponderance."[121]

---

[117] AR431, 4047.

[118] AR431, 4047.

[119] *LaAsmar*, 605 F.3d at 796 (citation and internal quotation marks omitted).

[120] *Van Steen v. Life Ins. Co. of N. Am.*, 878 F.3d 994, 997 (10th Cir. 2018).

[121] *Graham v. Hartford Life & Acc. Ins. Co.*, 589 F.3d 1345, 1358 (10th Cir. 2009) (quoting *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992)).

**A. Aetna's Decision to Deny Continued Treatment at ICH Was Arbitrary and Capricious.**

Aetna denied C.M.'s continued treatment at ICH because it determined he did not meet the LOCAT requirements for RTC level of care. Each of the four denial letters attempts to express Aetna's reasoning for the denial. However, it is unclear from the record whether Aetna analyzed C.M.'s condition under the appropriate LOCAT criteria and considered certain relevant medical records.

Aetna's original denial letter dated July 13, 2018 appears to confuse the relevant LOCAT standard. The denial letter states, "Based on LOCAT criteria and the information we have, we are denying coverage for the requested level of care. The information received does not show that you are reacting too strongly to things and *starting intense inappropriate arguments almost every day*."[122] The relevant LOCAT standard requires "intense inappropriate arguments occur *almost continuously*" or "arguments occur *almost daily* and involve periodic physical confrontation."[123] This is not the standard mentioned in the letter, which confuses the "almost continuously" and "almost daily" prongs and does not reference the "periodic physical confrontation" aspect, even though there is record evidence of numerous arguments and some physical confrontation.[124] In short, the reviewer misstated the relevant LOCAT guideline and did not reference the evidence of physical confrontation. As a result, the court cannot find that Aetna made a reasoned decision supported by substantial evidence.

---

[122] AR39 (emphasis added).

[123] AR11611.

[124] *See, e.g.*, AR17–30, 1488–1763.

Next, Aetna's Level One denial letter states, "For the dates under consideration there is no reported dangerousness toward self, or others."[125] However, it is unclear if Aetna considered certain actions as "dangerous" when reviewing the medical records. There are more than a few records that suggest "physical confrontation"—which is relevant under LOCAT—and which may be relevant to an assessment of dangerousness[126] under the Plan. None of these records are specifically identified or referenced in the denial. For instance: C.M. pulling on ICH staff after being "put in hand" for being defiant,[127] making "several threats to harm a peer" and being "threatening to others,"[128] launching "his body shoulder first into [a staff member's] ribs,"[129] escalating "both verbally and physically if he cannot be in charge of who and when he spends time with someone,"[130] taunting a peer and becoming "physically too close waving his arms around in the peers face,"[131] being physically aggressive and being "moved into the office until lunch,[132] becoming "physically aggressive" to the point of screaming and kicking a staff member in the leg,[133] throwing a pen at a staff member's face,[134] pulling on staff member's arm "aggressively" leading to physical intervention,[135] aggressively pulling away from a staff

---

[125] AR429.

[126] The court notes that it was unable to find a definition of "dangerousness" in LOCAT, nor did Aetna include a definition in its letter.

[127] AR1441.

[128] AR1382.

[129] AR1322.

[130] AR3175.

[131] AR3170.

[132] AR3125.

[133] AR2976.

[134] AR2844; *see also* AR2842.

[135] AR2670.

member leading to physical intervention,[136] "becoming verbally and physically aggressive" with a staff member and throwing "a heavy metal top" at the wall in close proximity to staff,[137] yanking on a staff member's arm and scratching her,[138] becoming "physically aggressive towards staff,"[139] and kicking and punching a staff member and threatening to kill her and her family.[140] There is no reference to and therefore no indication whether or how Aetna analyzed these behaviors under the LOCAT guidelines or what effect they may have had on the analysis regarding coverage.

The Level Two denial letter is similarly short on information and analysis. Like the Level One denial, it identically finds that "there was no reported dangerousness toward self, or others"[141] during the relevant review period. The record contains a letter from C.M.'s providers that was attached to the Level Two appeal asserting that, as of January 3, 2019, he "continues to put himself in situations where either he and/or other's safety was in danger."[142] The Level Two denial letter does not reference this letter from C.M.'s providers or address its allegation of "danger," so the court has no way to know if it was reviewed and considered. And like the Level One denial, it does not specifically reference any of the medical records or appeal references dealing with physical confrontation, including those referenced above and others like running

---

[136] AR2538.

[137] AR2504.

[138] AR2454.

[139] AR2449.

[140] AR2396–97.

[141] AR4046.

[142] AR2000–02.

over a staff member's foot with a scooter,[143] pushing a peer "in an attempt to fight,"[144] punching a staff member in the face,[145] "elbowing" a staff member,[146] and being "aggressive" and kicking a ball in a peer's face during PE.[147] The court cannot tell if Aetna considered these records in its review or discern whether Aetna would have found coverage appropriate for part or all of the time as a result.

Furthermore, the Level Two denial letter indicates that LOCAT did not support the RTC level of care because C.M. "did not meet all of the following criteria: 1) there was an immediate threat of further deterioration in mental status and a danger to self/others if not in RTC level of care and 2) RTC 24 x 7 stay was required for active diagnostic evaluation and treatment of an intensity that could be provided appropriately only in an RTC setting."[148] It is unclear to the court where these requirements come from as they do not appear in the LOCAT guidelines provided in the briefing. Without more, the court is unable to conclude if Aetna applied the proper LOCAT standard when it denied the Level Two appeal.

Finally, in somewhat similar fashion as the Level One and Level Two denials, the external review denial letter states that C.M. "was not physically aggressive."[149] While the external review letter is much more detailed in its review of C.M.'s medical records, the bald statement that C.M. "was not physically aggressive" appears simply wrong. As noted above,

---

[143] AR452.

[144] AR3649.

[145] AR3414, 3417.

[146] AR459, AR3407.

[147] AR4005.

[148] AR4046.

[149] AR5091.

there are multiple records evidencing physical aggression.[150] It is unclear if the reviewer missed those records or what the reviewer would have found was their impact on coverage.

For the foregoing reasons, the record as it currently stands does not provide substantial evidence to support Aetna's denial of benefits.[151] The noted gaps and discrepancies prevent the court from finding that the evidence is "adequate to support the conclusion reached by the decision-maker."[152]

**B. The Proper Remedy on this Record Is to Remand to Aetna.**

After determining that Aetna acted arbitrarily and capriciously, the court can "either remand the case to the administrator for a renewed valuation of the claimant's case, or it can award retroactive reinstatement of benefits."[153] Which remedy is proper "depends upon the specific flaws in the plan administrator's decision."[154] Remanding the case to the administrator for further findings or explanation is proper "if the plan administrator failed to make adequate findings or to explain adequately the grounds of its decision."[155] Here, Aetna failed to make adequate findings and adequately explain the grounds of its decision, including a clear and fully accurate reference to the applicable LOCAT standard. Furthermore, the record contains references to behaviors that include physical aggression and potential dangerousness. Reviewers' conclusions that there was "no reported dangerousness" and C.M. "was not physically

---

[150] *See* AR452, 1322, 1382, 1441, 2396–97, 2449, 2454, 2504, 2538, 2670, 2842, 2844, 2976, 3125, 3170, 3175, 3404, 3414, 3417, 3649, 4005.

[151] *See Van Steen*, 878 F.3d at 997.

[152] *Graham*, 589 F.3d at 1358 (quoting *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992)).

[153] *DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1175 (10th Cir. 2006).

[154] *Id.*

[155] *Id.* (cleaned up).

aggressive" with no reference at all, much less discussion, of providers' concerns about "danger" or addressing the instances of physical aggression and confrontation make it impossible for the court to conclude that Aetna's decision was not arbitrary and capricious.

Put simply, the court cannot determine whether there was sufficient evidence in the record to support a denial of the benefits.[156] Accordingly, the matter is remanded to Aetna to make a determination applying the correct LOCAT standard and involve a full review and consideration of all of C.M.'s relevant medical records.

### C.   Prejudgment Interest Is Not Appropriate Here.

Prejudgment interest is "appropriate when its award serves to compensate the injured party and its award is otherwise equitable" and is "considered proper in ERISA cases."[157] The Tenth Circuit has stated that prejudgment interest is "generally available to compensate the wronged party for being deprived of the monetary value of his loss from the time of the loss to the payment of the judgment."[158] Because the court remands this matter to Aetna for further consideration rather than awarding benefits, prejudgment interest is not warranted.

### D.   Attorney Fees and Costs Are Awarded to Plaintiffs.

ERISA authorizes the court to exercise discretion in awarding attorney fees to either party.[159] There is no requirement that a party first prevail to be eligible to receive an award.[160]

---

[156] *See DeGrado*, 451 F.3d at 1175–76.

[157] *Allison v. Bank One-Denver*, 289 F.3d 1223, 1243 (10th Cir. 2002), *as amended on denial of reh'g* (June 19, 2002).

[158] *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1286 (10th Cir. 2002) (quotation marks and citations omitted).

[159] 29 U.S.C. § 1132(g)(1).

[160] *Cordova v. United of Omaha Life Ins. Co.*, 708 F.3d 1196, 1207 (10th Cir. 2013).

The court may award fees "as long as the fee claimant has achieved 'some degree of success on the merits.'"[161] The Tenth Circuit has established five factors for the court to consider in making this determination:

> (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of fees; (3) whether an award of fees would deter others from acting under similar circumstances; (4) whether the party requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.[162]

"No single factor is dispositive and a court need not consider every factor in every case."[163]

First, Aetna is culpable for failing to indicate that it applied the proper LOCAT guidelines. The language in the original denial letter, Level One, and Level Two denials does not properly state the relevant LOCAT standard.[164] The standard is either missing or misstated. Additionally, Aetna found that there was "no reported dangerous" without addressing C.M.'s providers' contrary finding or any of the records showing physical confrontation, all of which would have been relevant to Aetna's coverage determination. In short, this lawsuit was necessary because of Aetna's missteps.[165] Second, Aetna's ability to satisfy an awards fee "is not seriously in question."[166] Third, an award of fees against Aetna would reasonably be expected to deter it

---

[161] *Id.* (citation omitted).

[162] *Id.*

[163] *Id.*

[164] AR39, 429, 4046.

[165] The court notes that it is not making a finding of bad faith.

[166] *James C. v. Aetna Health & Life Ins. Co.*, 499 F. Supp. 3d 1105, 1125 n.137 (D. Utah 2020). "While the court does not assign any weight to this factor, it clearly does not weigh against an award of fees and costs." *Id.* (citing cases supporting the same).

and others from these failings.[167] Fourth, the court finds that Plaintiffs' case is not focused on benefitting all members of the Plan or seeking to resolve an important legal question; while aspects of those features may be present, the case is firmly fixed on the Plaintiffs herein. Fifth, as discussed in this opinion, the court has agreed with Plaintiffs' position that Aetna's denial of benefits was arbitrary and capricious because there is insufficient evidence to show that it applied the correct LOCAT provisions and considered all relevant medical records. Additionally, the court has denied Defendants' arguments. Therefore, based on the totality of the foregoing factors, the court finds that on this record Plaintiffs are entitled to reasonable attorney fees and costs incurred to prosecute this matter.[168]

## ORDER

For the reasons stated in this Memorandum Decision and Order:

1.  Defendants' Motion for Summary Judgment is DENIED.

2.  Plaintiffs' Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART;

    a.  The court DENIES Plaintiffs' request to order payment of C.M.'s entire treatment under the Plan;

    b.  The court DENIES Plaintiffs' request for prejudgment interest; and

    c.  The court GRANTS Plaintiffs' motion to find Aetna's denial of benefits was arbitrary and capricious.

---

[167] *See id.* at 1125 n.138; *Spradley v. Owens-Illinois Hourly Employees Welfare Benefit Plan*, 686 F.3d 1135, 1140 (10th Cir. 2012).

[168] *See* 28 U.S.C. § 1920 (describing taxable costs).

3. Plaintiffs' request for attorney fees and costs is GRANTED. Within 21 days of this order, Plaintiffs' counsel should submit a petition for reasonable attorney fees and costs associated with this action, including an affidavit indicating a calculation of fees, an accounting of time, and costs.

4. Defendants' decisions denying C.M.'s continued residential treatment center care at ICH are VACATED, and this matter is remanded to Aetna for further proceedings consistent with this decision.

Dated November 24, 2021.

BY THE COURT

_____
David Barlow
United States District Judge